Michael J. Garcia, City Attorney, SBN 192848
Ann M. Maurer, Chief Assistant City Attorney, SBN 179649
AMaurer@glendaleca.gov
Miah Yun, Assistant City Attorney, SBN 218808
MYun@glendaleca.gov
Andrew Rawcliffe, Deputy City Attorney, SBN 259224
ARawcliffe@glendaleca.gov
613 E. Broadway, Suite 220
Glendale, CA  91206
Telephone:  (818) 548-2080
Facsimile:  (818) 547-3402

Bradley H. Ellis, SBN 110467
bellis@sidley.com
Frank J. Broccolo, SBN 210711
fbroccolo@sidley.com
Christopher S. Munsey, SBN 267061
cmunsey@sidley.com
Laura L. Richardson, SBN 288954
laura.richardson@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California  90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

Attorneys for Defendant
CITY OF GLENDALE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHIKO SHIOTA GINGERY, an individual, KOICHI MERA, an individual, GAHT-US Corporation, a California non-profit corporation, | Case No. 2:14-cv-1291-PA-AJW |
| | Assigned to: Hon. Percy Anderson |
| Plaintiffs, | **DEFENDANT CITY OF GLENDALE'S NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6), OR TO STRIKE PURSUANT TO RULE 12(f)** |
| vs. | |
| CITY OF GLENDALE, a municipal corporation, SCOTT OCHOA, in his capacity as Glendale City Manager, | |
| Defendants. | [Filed concurrently with Glendale's Special Motion to Strike; Request for Judicial Notice; Declarations of Christopher S. Munsey and Karen Cruz; and [Proposed] Orders] |
| | Date:       May 12, 2014 |
| | Time:      1:30 p.m. |
| | Place:     Courtroom 15 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE THAT on May 12, 2014, at 1:30 p.m. before the Honorable Percy Anderson in Courtroom 15 of the United States District Court for the Central District of California, located at 312 N. Spring Street, Los Angeles, California, Defendant City of Glendale ("Glendale") will and hereby does move to dismiss Plaintiffs Michiko Shiota Gingery, Koichi Mera, and GAHT-US Corporation's ("Plaintiffs") Complaint, or, in the alternative, to strike all references to 42 U.S.C. §§ 1983 and 1988 in the Complaint.  This Motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(f) on the following grounds:

1.     Plaintiffs have failed to establish any cognizable federal claim under the Supremacy Clause, 42 U.S.C. § 1983, or the Foreign Affairs Power.  This is because there is no valid claim that purely expressive, non-regulatory action is preempted by federal law.  Moreover, neither the Supremacy Clause nor the Foreign Affairs Power constitute a source of individual federal rights.

2.     Plaintiffs cannot allege any sufficient injury-in-fact to establish standing. Their purported offense arising from their disagreement with the Comfort Women Monument's view of historical facts is not a cognizable injury.

3.     The Complaint presents a nonjusticiable political question by asking the Court to interpret statements to the press by U.S. officials, and, based on that interpretation alone, unilaterally pronounce the content of U.S. policy regarding the Comfort Women.

4.     Glendale's right to expression and speech defeats Plaintiffs' purported claims of preemption under the federal government's foreign affairs powers.

5.     In any event, Plaintiffs must, but cannot, show any conflict between the Monument's message and U.S. policy.

6.     Plaintiffs' second cause of action should be dismissed because the alleged failure to comply with Roberts' Rules of Order is not a basis for invalidating

1

1   municipal action, and, in any event, the Council complied with both Roberts' Rules

2   and the Glendale City Charter in this case.

3          7.     Even if the Complaint is not subject to dismissal, the references to 42

4   U.S.C. §§ 1983 and 1988, which are completely undeveloped, and irrelevant and

5   impertinent to the issues raised therein, should be stricken.

6          Glendale's Motion is based upon this Notice of Motion and Motion; the

7   attached Memorandum of Points and Authorities; Glendale's concurrently-filed

8   Special Motion to Strike; the concurrently-filed Request for Judicial Notice; the

9   Declaration of Christopher S. Munsey; the Declaration of Karen Cruz; the pleadings

10  and papers on file in this case, including but not limited to the Complaint; and any

11  other arguments and other evidence as may be presented at the hearing on this matter.

12  Furthermore, Glendale reserves its right to seek costs and attorneys' fees at a later date

13  in the event that it prevails on this motion.

14         This motion is made following the conference of counsel pursuant to Central

15  District Local Rule 7-3, which took place on March 20, 2014.

16

17  Dated:        April 11, 2014

                                                                GLENDALE CITY ATTORNEY'S OFFICE

18                                                                 Michael J. Garcia
                                                               Ann M. Maurer

19                                                                 Miah Yun
                                                               Andrew Rawcliffe

20

21                                                                 SIDLEY AUSTIN LLP
                                                               Bradley H. Ellis

22                                                                 Frank J. Broccolo
                                                               Christopher S. Munsey

23                                                                 Laura L. Richardson

24                                                By: /s/ Bradley H. Ellis

25                                                                 Bradley H. Ellis
                                                               Attorneys for Defendant

26                                                                 CITY OF GLENDALE

27

28

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................1

STATEMENT OF FACTS ......................................................2

LEGAL STANDARD.............................................................6

ARGUMENT .........................................................................7

I.    Plaintiffs Do Not Allege A Valid Federal Claim ...............7

II.   Plaintiffs Do Not Have Standing To Bring Their Claims ...............8

    A.   Plaintiffs' Avoidance of Central Park and the Adult Recreation Center Because of their Disagreement with the Monument is Not a Cognizable Injury ..................8

    B.   The Monument's Purported "Potential to Disrupt" the U.S.'s Relations with Japan and South Korea and Act as an "Obstacle" to Maintaining Friendly Relations With Glendale's Sister-Cities Do Not Constitute Injury-In-Fact..................11

III.  Plaintiffs' First Cause Of Action Presents A Nonjusticiable Political Question...................12

    A.   Statement of Interest in Joo Demonstrates that the Court Should Dismiss the Case Under the Political Question Doctrine ..................12

    B.   All Political Question Factors Are Present Here and Confirm that Plaintiffs' Claim Should be Dismissed ..................13

        1.   Foreign Policy is Constitutionally Committed to the Executive and Legislative Branches of Government, and it Would Be Impossible for the Court to Hold that the Statute Conflicts with U.S. Policy Without First Declaring the Content of U.S. Policy Regarding the Comfort Women ..........14

        2.   No Judicially Discoverable and Manageable Standards Exist for Determining U.S. Foreign Policy on the Basis of the Remarks Cited in the Complaint..................14

        3.   The Other Political Question Factors also Weigh in Favor of Dismissal ..................15

IV.   Glendale's Right To Speak On Issues Of Historical Significance Precludes Plaintiffs' Claims Of Foreign Affairs Preemption ..................15

V.    The Monument Is Not Subject To Preemption ..................19

    A.   Plaintiffs Must, but Cannot, Show that the City's Conduct Conflicts with an Established Federal Policy ..................19

i

B.      The Complaint Fails to Allege Any Cognizable Effect on U.S. Foreign Policy Resulting from the Monument ...................................22

VI.     Plaintiffs' Second Cause Of Action Fails To State A Claim For Relief.......24

VII.    References To Sections 1983 And 1988 Should Be Stricken ......................24

CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affordable Housing Development Corp. v. Fresno,*
  433 F.3d 1182 (9th Cir. 2006) ...................................................................19

*Alameda Newspapers, Inc. v. City of Oakland,*
  95 F.3d 1406 (9th Cir. 1996) .............................................................1, 2, 16, 20

*Am. Ins. Co. v. Garamendi,*
  539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) ....................................19

*Ashcroft v. Iqbal,*
  556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ...............................7, 23

*Baker v. Carr,*
  369, U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ..................................15

*Barnes-Wallace v. City of San Diego,*
  530 F.3d 776 (9th Cir. 2008) ...................................................................10

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ....................................7

*Bond v. Floyd,*
  385 U.S. 116,135-136, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) ....................17, 18

*Boos v. Barry,*
  485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed. 333 (1988) .........................................17

*Caldwell v. Caldwell,*
  545 F.3d 1126 (9th Cir. 2008) .................................................................9, 10

*Citizens United v. Federal Election Comm'n.,*
  558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) ..............................16, 17

*City of Pasadena v. Paine,* 126 Cal.App.3d 93(1954) ...........................................24

*Columbia Broadcasting Systems, Inc. v. Democratic National Committee,*
  412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) .........................................15

*Corrie v. Caterpillar, Inc.,*
  503 F.3d 974 (9th Cir. 2007) .............................................................12, 14, 15

iii

*County of Suffolk v. Long Island Lighting Co.*,
  710 F.Supp. 1387 (1989) ...................................................................18

*Creek v. Village of Westhaven*,
  80 F.3d 186 (7th Cir. 1996) ..............................................................18

*DeGrassi v. City of Glendora*,
  207 F.3d 636 (9th Cir. 2000) ............................................................17

*Dichter-Mad Family Partners, LLP v. United States*,
  707 F.Supp.2d 1016 (C.D. Cal. 2010) ...............................................7

*Doan v. Singh*,
  1:13-CV-00531-LJO-SMS, 2013 WL 3166338 (E.D. Cal. June 20, 2013).......24

*Farley v. Healey*,
  67 Cal.2d 325 (1967) .................................................................1, 20

*First Nat. Bank of Boston v. Bellotti*,
  435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) ..................16, 18

*Friends of Roeding Park v. City of Fresno*,
  848 F.Supp.2d 1152 (E.D. Cal. 2012) ...............................................6

*Griswold v. Driscoll*,
  616 F.3d 53 (1st Cir. 2010)...............................................................16

*Guzman v. Bridgepoint Educ., Inc.*,
  11CV69 WQH WVG, 2013 WL 593431 (S.D. Cal. Feb. 13, 2013).................24

*Joo v. Japan*,
  413 F.3d 45 (D.C. Cir. 2005).............................................................13

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ................8, 11

*Manistee Town Center v. Glendale*,
  277 F.3d 1090 (9th Cir. 2000) ....................................................18, 19

*New West v. City of Joliet*,
  491 F.3d 717 (7th Cir. 2007) ............................................................18

*Ove v. Gwinn*,
  264 F.3d 817 (9th Cir. 2001) ............................................................23

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) ............................ 16, 20

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ..................................................................... 18, 19

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ............................................................................ 7

*Trunk v. City of San Diego*,
    568 F.Supp.2d 1199 (S.D. Cal. 2008) ............................................................... 9

*United States v. American Library Ass'n. Inc.*,
    539 U.S. 194, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) .................................. 15

*Valley Forge Christian College v. Americans United for Separation of Church
    and State*,
    454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ............................ 9, 10, 11

*Warren v. Fox Family Worldwide*,
    328 F.3d 1136 (9th Cir. 2003) .......................................................................... 8

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ........................................................................ 19

*Wood v. Georgia*,
    370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962) ...................................... 17

STATUTES

22 U.S.C. § 2151n(d) ............................................................................................ 4

28 U.S.C. § 1367 ................................................................................................. 23

42 U.S.C. § 1983 ............................................................................................. 8, 24

RULES

Federal Rule of Civil Procedure 12 ................................................................. *passim*

OTHER AUTHORITIES

U.S. Const. amend. I ....................................................................................... *passim*

H.R. Res. 121, 110th Cong. (2007) ........................................................... 2, 6, 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Matthew C. Porterfield, *State and Local Foreign Policy Initiatives and Free Speech: The First Amendment as an Instrument of Federalism*, 35 Stan. J. Int'l L. 1, 32 (1999) ............................................................................................16

GLENDALE'S MOTION TO DISMISS PURSUANT TO FRCP 12(b)(1) AND 12(b)(6), OR STRIKE PURSUANT TO FRCP 12(f)

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

On July 9, 2013, the City of Glendale ("Glendale") authorized the placement in a city-owned park of a monument to the Comfort Women – thousands of women forced into sexual slavery by the Imperial Japanese Army during World War II – along with a plaque that explains the symbolism of the monument and commemorates Glendale's and the U.S. House of Representative's recognition of the Comfort Women (the "Monument").  Plaintiffs contend that the Monument causes them offense and discomfort, and seek removal of the Monument under the guise that its mere presence interferes with the foreign affairs powers granted to the federal executive in the Constitution.  However, as the Ninth Circuit has observed, "[c]ities, counties, and states have a long tradition of issuing pronouncements, proclamations, and statements of principle on a wide range of matters of public interest," including on matters "such as foreign policy and immigration."  *Alameda Newspapers, Inc. v. City of Oakland*, 95 F.3d 1406, 1414 (9th Cir. 1996); *see also Farley v. Healey*, 67 Cal.2d 325, 328 (1967) ("city councils have traditionally made declarations of policy," including in areas like foreign policy, where they lacked "power to effectuate such declarations by binding legislation").  Plaintiffs' request that this Court intrude on this "long tradition" is not only unprecedented, but without basis, and the Court should summarily reject it for several independent reasons.

First, Plaintiffs fail to state a cognizable claim for relief.  There is no right to challenge a municipality's mere expression regarding historical events on the grounds that it interferes with the foreign affairs of the United States.  Second, Plaintiffs lack standing, because the harms alleged do not constitute a requisite injury-in-fact.  Third, Plaintiffs' request that the Court endorse their interpretation of U.S. policy regarding the Comfort Women issue presents a nonjusticiable political question.  Fourth, Glendale's right to speak precludes Plaintiffs' claims.  Fifth, even if Plaintiffs could challenge the Monument under the foreign affairs doctrine, the historical account

1

inscribed upon the Monument is entirely consistent with U.S. foreign policy on the issue.  Finally, Plaintiffs' second claim also fails to state a valid claim for relief because: (1) an alleged failure to comply with Robert's Rules of Order does not provide a sufficient basis to state a claim as a matter of law; and (2) regardless, the City of Glendale's installation of the Monument complied with these rules.  Thus, the Court should dismiss the Complaint.

If the Court were to do otherwise and allow this case to proceed, the results would be profound, calling into question the constitutionality of, among other things, innumerable public memorials, monuments, resolutions, museum exhibits, holidays, public school curricula, library selections, festivals and/or other events organized by cities, and "would mark an unprecedented and extraordinary intrusion into the rights of state and local governments[, as] [a]n inherent power of any sovereign government and one that is fundamental to any form of democracy is the ability to communicate with its citizenry."  *Alameda Newspapers, Inc.*, 95 F.3d at 1415.  For each of the reasons set forth herein, the Court should dismiss Plaintiffs' Complaint.

## STATEMENT OF FACTS

From 1932 to 1945, "as many as 200,000 women, including Koreans, Filipinos, Chinese, Indonesians, Dutch, and Japanese," were "forced to provide sexual services to Japanese troops."  (*See* Declaration of Christopher S. Munsey ("Munsey Decl."), Exh. 4 at 26-27 (Japan, Country Reports on Human Rights Practices, United States Department of State, Bureau of Democracy, Human Rights, and Labor, February 25, 2004).)  They faced "gang rape, forced abortions, humiliation, and sexual violence resulting in mutilation, death, or eventual suicide in one of the largest cases of human trafficking in the 20th century."  H.R. Res. 121, 110th Cong. (2007).  These women are referred to as "Comfort Women."  (*See, e.g.*, *id.*)

Between December 1991 and August 1993, the Japanese Government conducted a study of the Comfort Women issue.  On August 4, 1993, Japan reported the results of the study, documenting the Japanese Imperial Army's role in operating

"comfort stations", the deprivation of freedom and "misery" the women suffered, and the "recruitment" of women "against their own will."  (Exh. 6 to Munsey Decl. at 34-36 ("On the Issue of Wartime 'Comfort Women,'" Ministry of Foreign Affairs of Japan, Cabinet Councilors' Office of External Affairs, August 4, 1993).)

Then Chief Cabinet Secretary Yohei Kono issued a statement in connection with the release of the results of the study in which he stated that, "[u]ndeniably, this was an act, with the involvement of the military authorities of the day, that severely injured the honor and dignity of many women.  The Government of Japan would like to take this opportunity once again to extend its sincere apologies and remorse to all those, irrespective of place of origin, who suffered immeasurable pain and incurable physical and psychological wounds as comfort women."  (Exh. 7 to Munsey Decl. at 38 (Statement by Chief Cabinet Secretary Yohei Kono on the Result of the Study on the Issue of "'comfort women,'" (The "Kono Statement"), Ministry of Foreign Affairs of Japan, August 4, 1993).)

The Government of Japan has periodically reiterated its policy regarding the Comfort Women issue, noting that the Kono Statement acknowledged that the issue was "with the involvement of the military authorities of the day, a grave affront to the honor dignity of a large number of women," and that "Japan has . . . expressed its sincere apologies and remorse to the former 'comfort women' on many occasions."  (Exhs. 8 and 9 to Munsey Decl. at 42, 46 (Recent Policy of the Government of Japan on the Issue Known as "Wartime Comfort Women," Ministry of Foreign Affairs of Japan, November, 2001; Recent Policy of the Government of Japan on the Issue Known as "Comfort Women," Ministry of Foreign Affairs of Japan, April, 2007).)  Most recently, on March 14, 2014, Prime Minister Shinzo Abe stated that his government would not revise the Kono Statement and adheres to the apologies made by past governments.  (Exh. 10 to Munsey Decl. at 50 (Remarks by Japanese Prime Minister Abe during the Upper House Budget Session, Ministry of Foreign Affairs of Japan, March 14, 2014).)

1   The United States Government has also repeatedly recognized the

2   unconscionable crimes committed against the Comfort Women:

3   Official State Department Reports

4   The State Department regularly addresses the Comfort Women issue in its

5   human rights reports, which it is required to prepare and submit to Congress

6   annually.[1]  *See* 22 U.S.C. § 2151n(d) ("The Secretary of State shall transmit to the

7   Speaker of the House of Representatives and the Committee on Foreign Relations of

8   the Senate . . . each year, a full and complete report regarding . . . the status of

9   internationally recognized human rights").

10   The reports refer to the Comfort Women as, among other things, "as many as

11   200,000 women, including Koreans, Filipinos, Chinese, Indonesians, Dutch, and

12   Japanese, forced to provide sex to [Japanese troops] between 1932-45."  (Exh. 4 to

13   Munsey Decl. at 26 (2003 Japan Report); *see also* Exh. 12 to Munsey Decl. at 55

14   (2004 South Korea Report, February 28, 2005) ("women who, during World War II,

15   were forced to provide sex to soldiers of the Japanese Imperial Army"); Exh. 13 to

16   Munsey Decl. at 58 (2013 Japan Report, February 27, 2014) ("women who were

17   trafficked for sexual purposes during World War II").)

18   Statement of Interest of the United States Filed in *Joo v. Japan*

19   On May 8, 2001, the United States filed a Statement of Interest in *Joo v. Japan*,

20   Case No. 00-CV-2233 (D.D.C.) (Complaint, ¶ 44), which provides as follows:

21   "The named plaintiffs in this case are South Korean, Chinese,
22   and Filipinio women, as well as residents of Taiwan, who were
     held as "Comfort Women" during World War II by Japanese
     military forces.  The horror of plaintiffs' ordeal can scarcely be
23   overstated . . . At the conclusion of the Second World War, the

24   [1] The reports are used "by Congress in its decision-making processes surrounding foreign
25   security sector assistance and economic aid; by the Department of State and other U.S.
     government agencies in shaping American foreign policy; and by U.S. citizens, international
     nongovernmental organizations, foreign governments, human rights defenders, lawyers,
26   journalists, scholars, and others who are committed to advancing human dignity."  (Exh. 11
     to Munsey Decl. at 52 (Secretary of State's Preface to the 2013 Country Reports on Human
27   Rights Practices, United States Department of State, Bureau of Democracy Human Rights
     and Labor, February 27, 2014).)

28

United States condemned, in the strongest possible terms, the Japanese Government's conduct before and during the War[, and] conducted War Crimes Trials, which resulted in the execution or other punishment of hundreds of Japanese perpetrators of atrocities."  (Exh. 14 to Munsey Decl. at 61 (Statement of Interest, *Joo v. Japan*, Case No. 1:00-cv-02233-HHK (D.D.C.)).)

Statements By Executive Officials

U.S. officials have made similar statements.  For example, at a press briefing on August 16, 2012, State Department spokesperson Victoria Nuland stated that the United States has "made clear to both governments, all governments, that [it] use[s] the terms [Comfort Women and sexual slavery] interchangeably and will continue to do so," and that the U.S. "always raise[s the issue] in bilateral dialogue."  (Exh. 15 to Munsey Decl. at 79 (State Department, Transcript, Daily Press Briefing, August 16, 2012).)  On May 16, 2013, State Department spokesperson Jen Psaki stated that statements by the mayor of Osaka, Japan that the "comfort women were necessary during the war period," were "outrageous and offensive," and that, "[a]s the United States has stated previously, what happened in that era to these women who were trafficked for sexual purposes is deplorable and clearly a grave human rights violation of enormous proportions."[2] (Exh. 17 to Munsey Decl. at 85-86 (State Department, Transcript, Daily Press Briefing, May 16, 2013).)

At a press briefing on January 16, 2014, Ms. Psaki was specifically asked about the State Department's reaction to the "comfort women statute in southern California, which lots of Japanese politicians [are asking to be removed]," and responded that it was "unlikely" that the State Department would take a position, "given it sounds like it's happening in a state."  (Exh. 18 to Munsey Decl. at 89-90 (State Department, Daily Press Briefing, January 16, 2014).)

---

[2] *See also* Exh. 16 to Munsey Decl. at 82 (State Department, Off-Camera Daily Press Briefing, July 9, 2012) (when asked about the Comfort Women, Director of the Office of Press Relations Patrick Ventrell stated that "what happened to these women during World War II was deplorable.  The U.S. position is that it was a grave human rights violation of enormous proportions, and we extend our sincere and deep sympathy to the victims").

On March 6, 2014, U.S. Ambassador to South Korea Sung Kim reiterated the U.S.'s position that "the comfort women issue, or the sex slaves issue, is a grave human rights violation."  Exh. 19 to Munsey Decl. at 92 (video of Ambassador Kim's statement).)

Most recently, on March 10, 2014, Ms. Psaki stated that the Kono Statement and apology by then Japanese Prime Minister Tomiichi Murayama, "marked an important chapter in Japan improving relations with its neighbors," and stated that the United States "encourage[s] Japan's leadership to approach [the Comfort Women issue] and other issues arising from the past in a manner that is conducive to building stronger relations with its neighbors," and, as a result, the United States felt that the Japanese Government's decision to "uphold the Kono statement . . . was a positive step."  (Exh. 20 to Munsey Decl. at 96 (State Department, Daily Press Briefing, March 10, 2014).)

House Resolution 121

On June 30, 2007, the United States House of Representatives passed house Resolution 121, which announced the sense of the House of Representatives that the Government of Japan "should formally acknowledge, apologize, and accept historical responsibility in a clear and unequivocal manner for its Imperial Armed Force's coercion of young women into sexual slavery."  H. Res. 121, 110th Cong. (2007).

## LEGAL STANDARD

A plaintiff faced with a 12(b)(1) motion to dismiss "bears the burden of proving the existence of the court's subject matter jurisdiction."  *Friends of Roeding Park v. City of Fresno*, 848 F.Supp.2d 1152, 1159 (E.D. Cal. 2012), citing *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996).  "A federal court is *presumed to lack jurisdiction* in a particular case unless the contrary *affirmatively appears*."  *Id.* (emphasis added).  In a facial attack on jurisdiction, the plaintiff must prove that the allegations are sufficient on their face to invoke federal jurisdiction.  *Id.*  Courts may consider the allegations in the complaint, as well as any documents referenced therein

and materials subject to judicial notice.  *See, e.g., Dichter-Mad Family Partners, LLP v. United States*, 707 F.Supp.2d 1016, 1026 (C.D. Cal. 2010).  The 12(b)(6) pleading standards apply to jurisdictional allegations challenged under 12(b)(1) as well.  *See, e.g., id*. at 1025 n.10.

      To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  Because the "doors of discovery" do not open for "a plaintiff armed with nothing more than conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Court should discount allegations that are "merely conclusory, unwarranted deductions of fact, [and] unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Iqbal*, 556 U.S. at 678 (a pleading is insufficient if it provides only "labels and conclusions[,] a formulaic recitation of the elements of a cause of action[, or] naked assertion[s] devoid of further factual enhancement") (internal quotations omitted).  Courts should also discount allegations contradicted by materials incorporated into the complaint or subject to judicial notice.  *Sprewell*, 266 F.3d at 988.

## ARGUMENT

### I.    Plaintiffs Do Not Allege A Valid Federal Claim

      A plaintiff fails to allege a federal claim under 12(b)(1) where, as here, they have invented a federal right where no such right exists.  As explained more fully in Glendale's concurrently-filed Special Motion to Strike, the arguments of which are incorporated herein by this reference, Plaintiffs fail to allege any valid federal cause of action.  *See* Motion to Strike at 11-16.  First, purely expressive conduct cannot be "preempted" by federal law.  Where, as here, the challenged action does not regulate behavior, impose liabilities, or create rights, there is no law to preempt.  Indeed, Glendale was not able to locate *any* case holding that expressive, non-regulatory action by a state or local government was "preempted" by federal law.  Second,

1   Plaintiffs have not alleged a valid claim under 42 U.S.C. § 1983, because neither the

2   Supremacy Clause nor the foreign affairs sections of the Constitution is a source of

3   individual rights.  Plaintiffs have therefore invented a federal right where none exists.

4   Accordingly, Plaintiffs' first cause of action fails under 12(b)(1).[3]

5   **II.    Plaintiffs Do Not Have Standing To Bring Their Claims**

6          Where a plaintiff lacks standing to bring a claim, that claim is properly

7   dismissed under 12(b)(1).  *See Warren v. Fox Family Worldwide*, 328 F.3d 1136,

8   1140 (9th Cir. 2003).  Plaintiffs fail to allege an "invasion of a legally protected

9   interest which is (a) concrete and particularized[,] and (b) actual or imminent, not

10  conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112

11  S.Ct. 2130, 119 L.Ed.2d 351 (1992).  The Complaint appears to allege the following

12  injuries: (1) Plaintiffs' avoidance and/or diminishment of enjoyment of use of Central

13  Park and the nearby Adult Recreation Center as a result of their disagreement with and

14  feelings of exclusion, discomfort, anger, and offense at the presence of the Monument;

15  and (2) the Monument's supposed  "potential to disrupt" the United States' alliances

16  with Japan and South Korea, and to present an "obstacle" in maintaining friendly

17  relations with Glendale's sister-cities.  (Complaint, ¶¶ 6-8.)  Neither of these is

18  sufficient to establish standing.  Accordingly, Plaintiffs' first cause of action fails

19  under 12(b)(1).[4]

20         **A.    Plaintiffs' Avoidance of Central Park and the Adult Recreation
21                 Center Because of their Disagreement with the Monument is Not a
                   Cognizable Injury**

22         Plaintiffs claim they "would like to use" Central Park and the adjacent Adult

23  Recreation Center, but avoid doing so.  This is because the Monument's recognition

24  of the war crimes against the Comfort Women purportedly conveys a "pointed

25  ───────────────
    [3] Assuming that the Court finds that Plaintiffs have asserted a federal right under the
26  Supremacy Clause or the foreign affairs sections of the Constitution, Plaintiffs have still
    failed to state a valid claim for relief under 12(b)(6).
27  [4] Assuming that the Court finds that Plaintiffs have standing, Plaintiffs have still failed to
    state a claim for relief under 12(b)(6).
28

1  expression of disapproval of Japan and the Japanese people" and evokes feelings of
2  "exclusion, discomfort, and anger" in them diminishing their enjoyment of the park.
3  (Complaint, ¶¶ 6-8.)  Plaintiffs' purported basis of standing, which amounts to nothing
4  more than their disagreement with the view of historical facts espoused by the
5  Monument, fails.  *See Valley Forge Christian College v. Americans United for*
6  *Separation of Church and State*, 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700
7  (1982) ("the psychological consequence presumably produced by observation of
8  conduct with which one disagrees" is not a sufficient injury for standing); *see also*
9  *Caldwell v. Caldwell*, 545 F.3d 1126, 1133 (9th Cir. 2008) (offense resulting from a
10  mere "abstract objection" to how the government "presents [a particular] subject" is
11  not sufficient injury as it would turn courts into "a judicial version [ ] of college
12  debating forums").
13      First, the avoidance or diminishment of enjoyment of land as a result of feelings
14  of offense from the presence of a government display has never been held to constitute
15  injury-in-fact outside of the Establishment Clause context.  This is unsurprising, given
16  that "[i]n Establishment Clause cases, standing requirements are at their nadir."  *Trunk*
17  *v. City of San Diego*, 568 F.Supp.2d 1199, 1204-05 (S.D. Cal. 2008) (the court noted
18  that plaintiffs who alleged loss of enjoyment of public land "would likely be out of
19  court for lack of standing" if their claims "were based on any theory other than . . . the
20  Establishment Clause"), *rev'd on other grounds*, 629 F.3d 1099 (9th Cir. 2011).
21      Second, as a factual matter, Plaintiffs are simply incorrect that the Monument
22  includes a "pointed expression of disapproval of Japan and the Japanese people."
23  Rather, the Monument clearly explains that the "Japanese Imperial Army" (which no
24  longer exists) perpetuated all of the horrible crimes against the Comfort Women.
25  Indeed, by Plaintiffs' misguided "logic," any memorial that documents Nazi war
26
27
28

1   crimes would somehow attack present day Germans and/or Americans of German

2   descent.[5]

3       Plaintiffs have indicated that they believe *Barnes-Wallace v. City of San Diego*,

4   530 F.3d 776 (9th Cir. 2008), supports standing in this case.  They are wrong.  First,

5   *Barnes-Wallace* was an Establishment Clause case, and is therefore inapposite.  *Id*. at

6   783 (describing the plaintiffs' claims).  No case has extended the standing analysis in

7   *Barnes-Wallace* beyond the Establishment Clause context.  Second, in that case the

8   defendant city had provided "control" and "dominion" of the public land at issue to

9   the Boy Scouts, an organization that "discriminate[s] against people like [plaintiffs] . .

10  . [and] openly rejects their beliefs and sexual orientation."  *Id*. at 783, 785.  Here, by

11  contrast, the City has not given control over Central Park or the Adult Recreation

12  Center to any private organization, and certainly not any organization that

13  discriminates against, excludes, or condemns Plaintiffs or any group to which they

14  belong.  Nor can there be any suggestion that the City itself excludes or condemns any

15  group to which Plaintiffs belong.  The supposed harm to Plaintiffs results solely from

16  their disagreement with the message of the Monument.  That is insufficient.  *See*

17  *Valley Forge*, 454 U.S. at 485 ("the psychological consequence presumably produced

18  by observation of conduct with which one disagrees" is not a sufficient injury for

19  standing); *see also Caldwell*, 545 F.3d at 1133 (a mere "abstract objection" to how the

20  government "presents [a particular] subject" is not cognizable injury).

21      Glendale also notes that Plaintiff Mera's and GAHT-US's claims for standing

22  are even more attenuated that Plaintiff  Gingery's.  Mr. Mera lives in Los Angeles, not

23  Glendale, and he does not even contend that he lives in close proximity to Glendale.

24  Moreover, GAHT-US claims that it has "members" who live in Glendale, but fails to

25  describe the nature of its membership, its authority to act on their behalf, and/or who

26  ---

    [5] Plaintiffs also claim, without explanation, that the Monument is unfairly "one-sided," but
27  they do not, because they cannot, identify any false statement or what a "balanced" account
    of the war crimes against the Comfort Women would be.  In any case, it is entirely
28  permissible for Glendale to take a side in a historical debate.

these mystery members are.  Indeed, GAHT-US itself is located in Santa Monica, over twenty miles away from the Monument.  (*See* Exh. 21 to Munsey Decl. at 98 (results of business entity search for GAHT-US on California Secretary of State website).) Regardless, no Plaintiffs have standing in any event.

### B. The Monument's Purported "Potential to Disrupt" the U.S.'s Relations with Japan and South Korea and Act as an "Obstacle" To Maintaining Friendly Relations With Glendale's Sister-Cities Do Not Constitute Injury-In-Fact

Plaintiffs also allege that Plaintiff Michiko Shiota Gingery believes that the Monument has "the potential to disrupt the United States' strategic alliances with . . . Japan and South Korea," and that it "represents a significant obstacle in maintaining friendly relations among Glendale's sister-cities."  (Complaint, ¶ 6.)  Neither constitutes injury-in-fact.  First, these purported injuries are not personal to Plaintiffs. *See Lujan*, 504 U.S. at 575 ("it is not sufficient that [a plaintiff] has merely a general interest common to all members of the public").  Ms. Gingery's dedication to these issues does not make them relevant.  *See, e.g., Valley Forge*, 454 U.S. at 486 ("standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy").

Additionally, these alleged injuries are plainly not "actual" or "imminent." *See Lujan*, 504 U.S. at 564.  The Complaint quotes various Japanese officials, including the mayor of Glendale's Japanese sister city, criticizing the installation of the Monument.  However, it contains no facts suggesting that the Japanese Government has changed, or is even contemplating a change regarding, its relationship with the U.S.  It also does not allege that its sister city is considering ending the relationship between the cities.  Given that the Complaint was filed more than six months after the Monument was installed, the suggestion that it might damage or disrupt either U.S. relations with Japan and South Korea or the Sister City program is, at most, merely "conjectural" and "hypothetical."  *Id*. at 560.  Accordingly, Plaintiffs fail to allege a sufficient injury-in-fact, and the case must be dismissed for lack of standing.

### III.   Plaintiffs' First Cause of Action Presents a Nonjusticiable Political Question

The Court also lacks jurisdiction to hear Plaintiffs' first cause of action because it presents a nonjusticiable political question. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 981 (9th Cir. 2007) (political question doctrine is "inherently jurisdictional" and properly decided on a 12(b)(1) motion to dismiss). Accordingly, Plaintiffs' first cause of action must be dismissed under 12(b)(1).

Plaintiffs argue that the Monument is "inconsistent" with U.S. policy regarding the Comfort Women. (Complaint, ¶ 4.) In doing so, Plaintiffs necessarily ask the Court to determine that U.S. policy on the issue is, as Plaintiffs suggest, "to encourage the relevant foreign nations with direct involvement in the historic events involving the comfort women . . . to resolve the debate relating to comfort women between or among themselves without the involvement of the United States." *Id*. A determination regarding the content of U.S. foreign policy is not for the courts to make. *See Corrie*, 503 F.3d at 982 ("[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative [branches]"). Moreover, no statute, treaty, executive order, executive agreement, or other federal law exists regarding the comfort women issue. Rather than asking the court to construe a law, Plaintiffs are asking the Court to determine and pronounce the content of U.S. foreign policy based on nothing more than its interpretation of statements by certain State Department officials. (*See* Complaint, ¶¶ 46-48.)

#### A.   Statement of Interest in *Joo* Demonstrates that the Court Should Dismiss the Case Under the Political Question Doctrine

The statement of interest filed by the United States in *Joo v. Japan*, and cited in the Complaint as purported support for Plaintiffs' description of U.S. policy, confirms that this case presents a nonjusticiable political question. First, it explains that the "*litigation of these claims* [regarding the Comfort Women] in U.S. court . . . could have serious implications for stability in the region," and "*lawsuits* could disrupt

1   relations and ongoing negotiations" between Japan, China, and South Korea.  (*See*
2   Exh. 14 to Munsey Decl. at 75-76 (Statement of Interest) (emphasis added).)

3       Second, the Statement of Interest explained that the claims at issue in *Joo*, like
4   those here, had to be dismissed because they "involve[d] issues for which there are no
5   judicially manageable standards."  (*Id*. at 72.)  The "judgments required in foreign
6   affairs 'are delicate, complex, and involve large amounts of prophecy,'" and are,
7   therefore, "beyond areas of judicial expertise."  (*Id*. at 72-73.)

8       Finally, as the Complaint admits, the district court and the D.C. Circuit each
9   found that the case presented a nonjusticiable political question and therefore
10  dismissal was required.  *Joo v. Japan*, 413 F.3d 45, 52 (D.C. Cir. 2005).  Similarly,
11  the instant case must be dismissed under the Political Question Doctrine.

12  **B.    All Political Question Factors Are Present Here and Confirm that Plaintiffs' Claim Should Be Dismissed**

13  The Supreme Court has outlined six "independent tests" for determining
14  whether the doctrine applies and the case should be dismissed:
15
16          [1] a textually demonstrable constitutional commitment of
            the issue to a coordinate political department; or [2] a lack of
            judicially discoverable and manageable standards for
17          resolving it; or [3] the impossibility of deciding without an
            initial policy determination of a kind clearly for nonjudicial
18          discretion; or [4] the impossibility of a court's undertaking
            independent resolution without expressing lack of respect
19          due coordinate branches of government; or [5] an unusual
            need for unquestioning adherence to a political decision
20          already made; or [6] the potentiality of embarrassment from
            multifarious pronouncements by various departments on one
21          question. *See Baker v. Carr*, 369, U.S. 186, 217, 82 S.Ct.
            691, 7 L.Ed.2d 663 (1962).
22
23      All of these factors are present in this case, and the Complaint must therefore be
24  dismissed as presenting a nonjusticiable political question.
25
26
27
28

1. **Foreign Policy is Constitutionally Committed To the Executive and Legislative Branches of Government, and It Would Be Impossible for the Court to Hold that the Statute Conflicts with U.S. Policy without First Declaring the Content of U.S. Policy Regarding the Comfort Women**

As explained above, factors [1] and [3] apply here. There is a "textually demonstrable constitutional commitment" of foreign policy to the executive and legislative branches of government, s*ee, e.g.*, *Corrie*, 503 F.3d at 982, and the Court cannot hold that the Monument is inconsistent with U.S. policy without first making "an initial policy determination of a kind clearly for nonjudicial discretion" as to what that policy is. Thus, these factors weigh in favor of dismissal.

2. **No Judicially Discoverable and Manageable Standards Exist for Determining U.S. Foreign Policy on the Basis of the Remarks Cited in the Complaint**

There also exist no "judicially discoverable and manageable standards" for the Court to determine what U.S. foreign policy regarding the comfort women "is." As mentioned, no federal law addresses U.S. policy regarding the Comfort Women. The Court will have to interpret and weigh various statements to the press by State Department officials, official State Department reports, a House resolution, and the Statement of Interest in order to determine the U.S.'s policy. No judicial standards or doctrinal tests exist to allow the Court to do so. For instance, there are no standards that can guide the Court in determining whether the State Department's human rights reports are entitled to more or less evidentiary weight than the statements quoted in the Complaint. Similarly, no standards or doctrines exist to enable the Court to discern whether the statements cited in the Complaint are more or less indicative of U.S. policy than other statements by U.S. officials (including some of the very same officials). (*Compare* Complaint, ¶ 46, with statements described at *supra*, 5-6.) Moreover, the Court must also account for the Statement of Interest and House Resolution 121. Again, there is no clear standard by which the Court can determine that the statements on the Comfort Women issue contained therein are entitled to less weight than those cited in the Complaint.

14

### 3.     The Other Political Question Factors also Weigh in Favor of Dismissal

*Baker* factors [4], [5], and [6] have been described as "prudential considerations [that] *counsel* against judicial intervention." *Corrie*, 503 F.3d at 981 (emphasis in original).  These factors also apply in this case.  The United States has repeatedly – in official State Department documents, in a submission to a District Court, and in statements to the press – recognized the "grave human rights violation" that the Comfort Women suffered.  For the Court to hold that U.S. policy is to avoid taking a position on the "historical debate" regarding what happened to the Comfort Women would "express[ a] lack of respect" for the Executive branch officials tasked with determining the content of U.S. foreign policy.  *See Corrie*, 503 F.3d at 980.  Indeed, a judicial holding that, all of the Executive's prior statements on the issue notwithstanding, the U.S. takes no position on the "proper historical treatment" of the Comfort Women, *see* Complaint, ¶ 61, risks "embarrassment from multifarious pronouncements by various departments." *Corrie*, 503 F.3d at 980.

### IV.     Glendale's Right To Speak On Issues Of Historical Significance Precludes Plaintiffs' Claims Of Foreign Affairs Preemption

Although neither the Supreme Court nor the Ninth Circuit has directly addressed the issue (*See United States v. American Library Ass'n. Inc.*, 539 U.S. 194, 210-211, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003)), the Court should hold that the Monument is constitutionally protected from foreign affairs preemption under the First Amendment.[6]

The Court should find that Glendale has a First Amendment right to speak that prevents any purported foreign affairs preemption.  As Chief Judge Posner of the Seventh Circuit has noted:

---

[6] Glendale recognizes that other jurisdictions have held that municipalities do not have First Amendment rights.  However, their reasoning has not been adopted by the U.S. Supreme Court. *American Library Ass'n*, 539 U.S. at 210-211 (discussing Stewart, J, *concurrence*, *Columbia Broadcasting Systems, Inc. v. Democratic National Committee*, 412 U.S. 94, 139, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973)).

1
2
3
4
5

> There is . . . an argument that the marketplace of ideas would be unduly curtailed if municipalities could not freely express themselves on matters of public concern . . . To the extent, moreover, that a municipality is the voice of its residents – is, indeed, a megaphone amplifying voices that might not otherwise be audible – a curtailment of its right to speak might be thought a curtailment of the unquestioned First Amendment right of those residents.  *Creek v. Village of Westhaven*, 80 F.3d 186, 193 (7th Cir. 1996).

6
7
8
9
10
11
12
13
14
15

The U.S. Supreme Court has held "the placement of a permanent monument in a public park is best viewed as a form of government speech."  *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 464, 129 S.Ct.1125, 172 L.Ed.2d 853 (2009). "Cities, counties, and states have a long tradition of issuing pronouncements, proclamations, and statements of principle on a wide range of matters of public interest, including [as to] matters subject to preemption, such as foreign policy and immigration."  *Alameda Newspapers, Inc.,* 95 F.3d at 1414.  Public school curriculum on the Armenian Genocide constitutes government speech as well.  *Griswold v. Driscoll*, 616 F.3d 53, 58-59 (1st Cir. 2010).  This speech cannot be interfered with under the guise of purported foreign affairs preemption.  U.S. Const. amend. I.

16
17
18
19
20
21
22
23
24
25
26
27

The First Amendment protects both an individual's right to self-expression and the "*public's access to discussion, debate, and the dissemination of information and idea*."  *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (emphasis added).  "The central function of the First Amendment is not to preserve individual rights, but to protect our democratic society by permitting the free discussion and debate issues of public concern."  Matthew C. Porterfield, *State and Local Foreign Policy Initiatives and Free Speech: The First Amendment as an Instrument of Federalism*, 35 Stan. J. Int'l L. 1, 32 (1999) (citing *Belotti*, 435 U.S. at 776-778).  "The concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment."  *Citizens United v. Federal Election Comm'n.*, 558 U.S. 310, 349-350, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (citation omitted).

28

1    City council members, like other elected officials, are given the widest latitude

2    under the First Amendment to express their views on matters of foreign policy.  *See*

3    *Bond v. Floyd*, 385 U.S. 116,135-136, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966); *see also*

4    *DeGrassi v. City of Glendora*, 207 F.3d 636, 646 (9th Cir. 2000).  "Political speech is

5    'indispensable to decision making in a democracy. . . .'" *Citizens United*, 558 U.S.  at

6    349, citing *Bellotti*, 435 U.S. at 777.  Speech on foreign policy is classic political

7    speech.  *See Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed. 333 (1988).

8    Elected officials are afforded broad protection under the First Amendment for

9    the following two reasons.  First, elected officials do not relinquish their right to self-

10   expression upon assuming elective office.  *See Bond*, 385 U.S. at 135. Second, as

11   elected representatives of their community, they ". . . have an obligation to take

12   positions on controversial political questions so that their constituents can be fully

13   informed by them, and be better able to assess their qualifications for office; also so

14   they can be represented in government debates by the person they have elected to

15   represent them."  *Bond*, 385 U.S. at 136-137; *see also Wood v. Georgia*, 370 U.S. 375,

16   395, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962) ("[t]he role that elected officials play in our

17   society makes it all the more imperative that they be allowed freely to express

18   themselves on matters of current public importance.").

19   Thus, following the logic of the United States Supreme Court in recent

20   decisions, the First Amendment should also protect council members when they speak

21   as a collective body on matters of foreign policy.  *Cf. Citizens United*, 558 U.S. at 343

22   ("[t]he Court has thus rejected the argument that political speech of corporations or

23   other associations should be treated differently under the First Amendment simply

24   because such associations are not 'natural persons.'") (citation omitted).

25   Moreover, the First Amendment protects the "'open marketplace' of ideas." *Id.*

26   at 354.  It does so by "protect[ing] speech and speaker, and the ideas that flow from

27   each." *Id*. at 341.  More simply put, the First Amendment protects political speech no

28   matter the identity of the speaker.  *Id*. at 350.  The justification being that "[t]he

17

inherent worth of . . . speech in terms of its capacity for informing the public does not depend on the identity of its source, whether corporation, association, union, or individual." *Bellotti*, 435 U.S. at 777.

When viewed in terms of capacity to inform the public, municipalities are similar to the elected officials who comprise them and have a stronger claim for free speech under the First Amendment than corporations. *See* Porterfield, *supra*, at 32; *see Bond*, 385 U.S. at 135-136; *see also Creek*, 80 F.3d at 193. Indeed, at least one lower court has held that "[a] municipal corporation, like any corporation [or association], is protected under the First Amendment in the same manner as an individual." *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1387, 1390 (1989), *aff'd.*, 907 F.2d 1295 (2nd Cir. 1990).

Additionally, Glendale's installation of the Monument implicates the *Noerr-Pennington* doctrine, which protects activity related to the right to petition, including litigation, lobbying, and speech, and which has its foundations in the First Amendment. [7] *New West v. City of Joliet*, 491 F.3d 717,722 (7th Cir. 2007). "[The *Noerr-Pennington*] doctrine is understood as an application of the First Amendment's speech and petition clauses." *Ibid*; *see also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006) ("*Noer-Pennington* . . . applies equally in all contexts"). "As far as the national government is concerned, a municipality has a right to speak and petition for redress of grievances, so the *Noerr-Pennington* doctrine applies fully to municipal

---

[7] It is important to note the Ninth Circuit's rationale for recognizing a municipality's right to petition is the same as it is for the right to speech. *Compare Manistee Town Center v. Glendale*, 277 F.3d 1090, 1093-1094 (9th Cir. 2000) ("Government officials are frequently called upon to be ombudsmen for their constituents. In this capacity, they intercede, lobby, and generate publicity to advance their constituents' goals, both expressed and perceived. This kind of petition may be nearly as vital to the functioning of modern representative democracy as petition that originates with a private citizen"), *with Creek*, 80 F.3d at 193 ("There is . . . an argument that the marketplace of ideas would be unduly curtailed if municipalities could not freely express themselves on matters of public concern . . . To the extent, moreover, that a municipality is the voice of its residents – is indeed, a megaphone amplifying voices that might not otherwise be audible – a curtailment of its right to speak might be thought a curtailment of the unquestioned First Amendment right of those residents.")

1 activities." *Ibid*. (citing *City of Columbia v. Omni Outdoor Advertising, Inc.* 499 U.S.

2 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991); *Affordable Housing Development Corp.*

3 *v. Fresno*, 433 F.3d 1182, 1193 (9th Cir. 2006); *White v. Lee*, 227 F.3d 1214, 1231-33

4 (9th Cir. 2000).  The petition rights of local governments and their constituents would

5 be *severely* infringed if those governments could not express and memorialize their

6 constituents' values on issues of public concern (for instance, by installing a

7 monument in a public park), even if they cannot not directly legislate regarding those

8 issues.  *Manistee Town Center v. Glendale*, 277 F.3d at 1093 ("Government officials

9 are frequently called upon to be ombudsmen for their constituents.  In this capacity,

10 they intercede, lobby, and generate publicity to advance their constituents' goals, both

11 expressed and perceived.  This kind of petitioning may be nearly as vital to the

12 functioning of a modern representative democracy as petitioning that originates with

13 private citizens").

14      Although the Court need not find that municipalities have First Amendment

15 rights for all purposes, based on these principles, Glendale's right to expression

16 defeats any purported claim of foreign affairs preemption.  Accordingly, Plaintiffs'

17 first cause of action must be dismissed under 12(b)(6) as Plaintiffs have failed to state

18 a claim for relief.

19 **V.    The Monument Could Not Be Subject To Preemption for Other Reasons**

20     **A.    Plaintiffs Must, but Cannot, Show that the City's Conduct Conflicts with an Established Federal Policy**

21

22      Even if speech could be "preempted" by the United States Constitution (which,

23 as explained in Section IV, *supra*, it cannot), the Supreme Court has explained that

24 where, as here, a city or state acts within an area of "traditional competence . . . it

25 might make good sense to require a conflict" with federal policy in order to find

26 preemption.  *See Am. Ins. Co. v. Garamendi*, 539 U.S. 396, 420, 123 S.Ct. 2374, 156

27 L.Ed.2d 376 (2003).  As the Ninth Circuit has held, cities have a "long tradition of

28 issuing pronouncements, proclamations, and statements of principle on a wide range

of matters of public interest," including "foreign policy and immigration." *Alameda Newspapers*, 95 F.3d at 1414; *see also Farley*, 67 Cal.2d at 328; *Summum*, 555 U.S. at 470 ("Governments have long used monuments to speak to the public").[8]  Thus, Plaintiffs must, but cannot, show that the Monument conflicts with any federal policy. Indeed, as explained in the Statement of Facts, to the extent that the United States has a discernible foreign policy regarding the Comfort Women issue, it is completely consistent with the Monument (which even goes so far as to commemorate the United States House of Representatives' resolution addressing the Comfort Women). Although there is no federal statute, treaty, executive agreement, executive order, or other federal law that addresses the Comfort Women, official State Department reports, court filings by the U.S., statements by executive officials, including those quoted in the Complaint, and Congressional action all demonstrate that the Monument is consistent with federal policy.  For example:

- The State Department regularly addresses the issue of the Comfort Women in its legally-mandated human rights reports to Congress, which have stated, among other things, that the comfort women were "as many as 200,000 women, including Koreans, Filipinos, Chinese, Indonesians, Dutch, and Japanese, forced to provide sex [to Japanese troops] between 1932-45."  *Supra* at 4 (quoting Exh. 4 to Munsey Decl. at 26).

- In its Statement of Interest in *Joo v. Japan*, the United States stated that the plaintiffs there "were held as 'Comfort Women' during World War II by Japanese military forces . . . At the conclusion of the Second World War, the United States condemned, in the strongest possible terms, the

---

[8] In *Summum*, the Supreme Court recognized that localities regularly accept monuments and memorials to controversial foreign policy issues, such as wars.  *Summum*, 555 U.S. at 480 (rejecting argument that "[e]very jurisdiction that has accepted a donated war memorial [must] provide equal treatment for a donated monument questioning the cause for which the veterans fought").

Japanese Government's conduct before and during the War."  *Supra* at 5 (quoting Exh. 14 to Munsey Decl. at 61).

- State Department officials have addressed the Comfort Women issue in remarks to the press on a number of occasions, and have repeatedly reiterated the U.S.'s position that "what happened in that era to these women who were trafficked for sexual purposes is deplorable and clearly a grave human rights violation of enormous proportions."  *Supra* at 5 (quoting Exh. 17 to Munsey Decl. at 85-86).

- On June 30, 2007, the United States House of Representatives passed House Resolution 121, which announced the sense of the House that the Government of Japan "should formally acknowledge, apologize, and accept historical responsibility in a clear and unequivocal manner for its Imperial Armed Force's coercion of young women into sexual slavery."  *See supra* at 6.

Indeed, none of the statements cited in the Complaint even implies a conflict between the Monument and U.S. policy.  First, as already shown, the Statement of Interest's description of the issue is entirely consistent with the view of historical events expressed by the Monument.[9]  Second, the January 7, 2013 remarks by Victoria Nuland simply did not address the U.S.'s position regarding the proper historical treatment of the comfort women.  (*See* Exh. 22 to Munsey Decl. at 101 (State Department Transcript, Daily Press Briefing, January 7, 2013).)  Instead, she was responding to a question about whether the Japanese Government's possible review of the Kono Statement "could have a bleed-over to . . . U.S.-Japan-Korea relations," and,

---

[9] Moreover, the Complaint's description of the Statement of Interest is plainly false. Nowhere did the Statement suggest that merely "addressing the comfort women issue in the United States could disrupt Japan's 'delicate' relations with China and Korea."  (Complaint, ¶ 44.)  Instead, the Statement warned against the "litigation of these claims in U.S. court" and "lawsuits" regarding these issues.  (*See* Exh. 14 to Munsey Decl. at 75-76.)

notably, she did not respond that the U.S. *was* concerned about the issue's effect on U.S. policy.  (*Id.*)  Similarly, neither Secretary Kerry's remarks nor the question to which he was responding referred to the Comfort Women at all.  Even to the extent that the Secretary's comments can be read to address the issue, his statement that the United States "urge[s] both [Japan and South Korea] to work *with us* – meaning the U.S. – "together to find a way forward to help resolve these deeply felt historic differences that still have meaning today" demonstrates that the U.S. does not take a "hands off" approach to the issue.  (*See* Exh. 23 to Munsey Decl. at 105 (State Department, Secretary John Kerry's Remarks with Republic of Korea Foreign Minister Yun Byung-se, February 13, 2014).)  Finally, the statements by Assistant Secretary of State for East Asian and Pacific Affairs Daniel Russel are taken from an interview he gave to the Yonhap News Agency on February 17, 2014, in which Secretary Russel is neither quoted, nor even described, as stating "the U.S.'s position on the comfort women issue," as the Complaint contends.  In fact, the article states that "Russel agreed that there is more that can be done for the remaining several dozen victims of the 'dreadful and shameful era in human history.'"  (*See* Exh. 24 to Munsey Decl. at 109 (Lee Chi-dong, *Russel: Korea-Japan history row not insurmountable*, Yonhap News Agency, Feb. 17, 2014).)

### B.   The Complaint Fails to Allege Any Cognizable Effect on U.S. Foreign Policy Resulting from the Monument

Moreover, despite the Complaint's doomsday prediction that Glendale's installation of a statue memorializing historical events will "undermine the U.S. government's foreign relations with a critical Asian ally and . . . destabilize already strained diplomatic relations," the Complaint fails to allege any actual disruption of U.S. foreign policy in the more than eight months since the Monument was unveiled on July 30, 2013.  Indeed, on February 7, 2014, more than six months after the Monument was unveiled and two weeks before the Complaint was filed, Japanese Foreign Minister Fumio Kishida stated, after a meeting with Secretary Kerry, that

22

Japan and the U.S. "have been having close communications, and we welcome those communications.  And we have agreed to have seamless exchanges at a high level going forward."  (Exh. 25 to Munsey Decl. at 114 (Department of State, Transcript of Remarks, February 7, 2014).)  Additionally, President Obama, Japanese Prime Minister Shinzo Abe, and South Korean President Park Guen-hye had a trilateral meeting on March 25, 2014, about which Prime Minister Abe stated that he was "so delighted [to be] able to hold the Japan-U.S.-Republic of Korea trilateral summit today."  (Exh. 26 to Munsey Decl. at 115 (Remarks by President Obama, President Park of the Republic of Korea, and Prime Minister Abe of Japan, The White House, Office of the Press Secretary, March 25, 2014).)  Finally, President Obama is scheduled to meet with both Prime Minister Abe and President Park during a trip to Asia in April.  (See Exh. 27 to Munsey Decl. at 118 (Statement by the Press Secretary on the President's Travel to Asia in April, The White House, Office of the Press Secretary, February 12, 2014).)

        Thus, in the face of these numerous official State Department documents demonstrating the health of U.S. foreign policy, the Court should reject the Complaint's conclusory assertion that the Monument has "great potential" for disrupting U.S. policy in East Asia.  *See Iqbal*, 556 U.S. at 678 ("mere conclusory statements" are insufficient).  As is unsurprising, Glendale's purely expressive act of erecting a statue that commemorates historical events (the accuracy of which Plaintiffs do not question) has had, and will have, no effect on U.S. foreign policy.  For this reason as well, the Court should dismiss Plaintiffs' first cause of action for failure to state a claim under 12(b)(6).[10]

---

[10] If the Court dismisses Plaintiffs' first cause of action, it should also dismiss Plaintiffs' purported state law claim, for which the only alleged jurisdictional basis is supplemental jurisdiction under 28 U.S.C. § 1367.  *See Ove v. Gwinn*, 264 F.3d 817, 826 (9th Cir. 2001) (district court that dismissed federal causes of action for failure to state a claim had discretion to dismiss state claims pursuant to 28 U.S.C. § 1367(c)(3)).

## VI.   Plaintiffs' Second Cause Of Action Fails To State A Claim For Relief

As explained more fully in Glendale's concurrently-filed Special Motion to Strike, the arguments of which are incorporated herein by this reference, Plaintiffs' second cause of action based on Glendale's alleged failure to follow Robert's Rules of Order fails as a matter of law.  (*See* Special Motion to Strike at 16-17.)  Robert's Rules of Order are procedural, and the failure to observe one of the rules does not invalidate an action by the City Council.  *See City of Pasadena v. Paine*, 126 Cal.App.3d 93, 96 (1954).  And, in any event, the City Council properly approved the Monument.  As a result, Plaintiffs' purported state law cause of action fails, and must be dismissed under Rule 12(b)(6).

## VII.   References To Sections 1983 And 1988 Should Be Stricken

Alternatively, the Court should strike as immaterial and impertinent all references to Sections 1983 and 1988 in the Complaint under Federal Rule of Civil Procedure 12(f).  The Complaint merely includes a single citation to Section 1983, and does not further address Section 1983 or any claim that Plaintiffs purportedly have under it.  Accordingly, the offhand reference to Section 1983 is immaterial and irrelevant to the issues in question, and should be stricken.[11]  *Doan v. Singh*, 1:13-CV-00531-LJO-SMS, 2013 WL 3166338, at *14 (E.D. Cal. June 20, 2013) (striking references to various quoted statutes where such statutes were not at issue in the case).  Furthermore, allowing this single reference to Section 1983 will prejudice Glendale as the reference leads to confusion as to which claims are properly being asserted in the Complaint.  *See Guzman v. Bridgepoint Educ., Inc.*, 11CV69 WQH WVG, 2013 WL 593431, at *4 (S.D. Cal. Feb. 13, 2013) (stating that it may be proper to grant a motion to strike if it will eliminate "confusion of the issues").

---

[11] The reference to Section 1988 in the Prayer for Relief is similarly irrelevant and impertinent, and should also be stricken.

1

## <u>CONCLUSION</u>

2      For all of the foregoing reasons, the Complaint must be dismissed.

3

4    Dated:      April 11, 2014

5                                          GLENDALE CITY ATTORNEY'S OFFICE
                                           Michael J. Garcia
                                           Ann M. Maurer
6                                          Miah Yun
                                           Andrew Rawcliffe
7
                                           SIDLEY AUSTIN LLP
8                                          Bradley H. Ellis
                                           Frank J. Broccolo
9                                          Christopher S. Munsey
                                           Laura L. Richardson
10

11                                         By:  /s/ Bradley H. Ellis
                                                Bradley H. Ellis
12                                              Attorneys for Defendant
                                                CITY OF GLENDALE
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28