MAYER BROWN LLP
NEIL M. SOLTMAN (SBN 67617)
  nsoltman@mayerbrown.com
MATTHEW H. MARMOLEJO (SBN 242964)
  mmarmolejo@mayerbrown.com
RUTH ZADIKANY (SBN 260288)
  rzadikany@mayerbrown.com
REBECCA B. JOHNS (SBN 293989)
  rjohns@mayerbrown.com
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone:   (213) 229-9500
Facsimile:   (213) 625-0248

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHIKO SHIOTA GINGERY, an individual, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF GLENDALE, a municipal corporation,<br><br>Defendants. | Case No. 2:14-cv-1291-PA-(AJWx)<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6), OR TO STRIKE PURSUANT TO FEDERAL RULE 12(f)**<br><br>Hon. Percy Anderson |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................1

II.  LEGAL STANDARD.................................................................2

III.  PLAINTIFFS ADEQUATELY ALLEGE A FEDERAL CLAIM...............3

IV.  PLAINTIFFS SUFFICIENTLY PLEAD ARTICLE III STANDING .........5

    A.  Plaintiffs' Loss of Enjoyment Or Use of Glendale's Public Land Is A Sufficient Injury To Confer Standing ...............................6

    B.  Glendale Lacks Authority To Support Its Standing Challenge ..........8

V.  GLENDALE'S ACTION IS PREEMPTED BY THE FEDERAL GOVERNMENT'S EXCLUSIVE AUTHORITY TO REGULATE FOREIGN AFFAIRS...................................................................9

VI.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE POLITICAL QUESTION DOCTRINE ..........................................................15

VII.  GLENDALE DOES NOT HAVE A FIRST AMENDMENT RIGHT TO SPEAK ABOUT FOREIGN POLICY ISSUES ..................................16

    A.  Government Speech Is Constrained By The Constitution.................17

    B.  Glendale's Plaque Is Not The Speech Of Its Individual City Council Members.............................................................20

VIII.  CONCLUSION ......................................................................22

OPPOSITION TO GLENDALE'S MOTION TO DISMISS; CASE NO. 2:14-CV-1291-PA-(AJWX)

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alameda Newspapers, Inc. v. City of Oakland*,
  95 F.3d 1406 (9th Cir. 1996)............................................................................19

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003).......................................................................... 1, 4, 10, 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................2

*Barnes-Wallace v. City of San Diego*,
  530 F.3d 776 (9th Cir. 2008)........................................................................7, 8

*Barnes-Wallace v. City of San Diego*,
  704 F.3d 1067 (9th Cir. 2012)..........................................................................7

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................2

*Bond v. Floyd*,
  385 U.S. 116 (1996)........................................................................................21

*Boy Scouts of Am. v. Dale*,
  530 U.S. 650 (2000)........................................................................................19

*Buono v. Norton*,
  371 F.3d 543 (9th Cir. 2004)............................................................................6

*Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*,
  217 F. Supp. 2d 1028 (C.D. Cal. 2002) ............................................................3

*Caldwell v. Caldwell*,
  545 F.3d 1126 (9th Cir. 2008)..........................................................................9

*Catholic League for Religious Rights v. City & Cnty. Of San Francisco*,
  624 F.3d 1043 (9th Cir. 2010)......................................................................5, 6

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
  412 U.S. 94 (1973) .........................................................................................17

ii

*Creek v. Village of Westhaven*,
    80 F.3d 186 (7th Cir. 1996).......................................................................17, 18

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)....................................................................................4

*DeGrassi v. City of Glendora*,
    207 F.3d 636 (9th Cir. 2000)......................................................................21

*Deirmenjian v. Deutsche Bank, A.G.*,
    526 F. Supp. 2d 1068 (C.D. Cal. 2007)......................................................1

*Dennis v. Higgins*,
    498 U.S. 439 (1991)................................................................................3, 4

*Desert Citizens Against Pollution v. Bisson*,
    231 F.3d 1172 (9th Cir. 2000)....................................................................5

*Deutsch v. Turner Corp.*,
    324 F.3d 692 (9th Cir. 2003)..............................................................passim

*Estiverne v. Louisiana State Bar Ass'n*,
    863 F.2d 371 (5th Cir. 1989)......................................................................17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*,
    528 U.S. 167 (2000)............................................................................5, 6, 7

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)..................................................................................20

*Hannan v. Maxim Integrated Prods., Inc.*,
    394 F. App'x 434 (9th Cir. 2010)................................................................2

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)..............................................................................10, 19

*Japan Line, Ltd. v. Los Angeles County*,
    441 U.S. 434 (1979)..................................................................................14

*Joo v. Japan*,
    413 F.3d 45 (D.C. Cir. 2005)....................................................................16

*Kearney v. Foley & Lardner, LLP*,
    590 F.3d 638 (9th Cir. 2009)......................................................................21

iii

*Los Angeles Cnty Bar Ass'n v. Eu*,
  979 F.2d 697 (9th Cir. 1992)............................................................................16

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)........................................................................................5

*Manistee Town Center v. Glendale*,
  227 F.3d 1090 (9th Cir. 2000).......................................................................21

*Mitsubishi Materials Corp. v. Superior Court*,
  113 Cal. App. 4th 55 (2003).....................................................................1, 15

*Moss v. U.S. Secret Serv.*,
  572 F.3d 962 (9th Cir. 2009)...........................................................................2

*Movsesian v. Victoria Versicherung AG*,
  670 F.3d 1067 (9th Cir. 2012) ..............................................................passim

*Muir v. Ala. Educ. Television Comm'n*,
  688 F.2d 1033 (5th Cir. 1982) .......................................................................17

*Nat'l Foreign Trade Council v. Baker*,
  26 F. Supp. 2d 287 (D. Mass. 1998) ...............................................................4

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999)............................................................................17

*New York Times Co. v. City of New York Commission on Human Rights*,
  41 N.Y.2d 345 (1977)....................................................................................14

*Oracle Am., Inc. v. Micron Tech., Inc.*,
  817 F. Supp. 2d 1128 (N.D. Cal. 2011)...........................................................3

*Peloza v. Capistrano Unified Sch. Dist.*,
  37 F.3d 517 (9th Cir. 1994).............................................................................2

*Pleasant Grove City, Utah v. Summum*
  555 U.S. 460, 129 S. Ct. 1125 (2009) ....................................................18, 19

*R.J. Reynolds Tobacco Co. v. Bonta*,
  272 F. Supp. 2d 1085 (E.D. Cal. 2003) ...................................................17, 18

*RDF Media Ltd. v. Fox Broad. Co.*,
  372 F. Supp. 2d 556 (C.D. Cal. 2005).............................................................3

iv

*Red River Freethinkers v. City of Fargo*,
  679 F.3d 1015 (8th Cir. 2012)..................................................................6

*Rosenberger v. Rector and Visitors of Univ. of Virginia*,
  515 U.S. 819 (1995)...............................................................................18

*Separation of Church & State Comm. v. City of Eugene of Lane Cnty., State of Or.*,
  93 F.3d 617 (9th Cir. 1996) ....................................................................20

*Sierra Club v. Morton*,
  405 U.S. 727 (1972)..................................................................................5

*Steinberg v. Int'l Comm'n on Holocaust Era Ins. Claims*,
  133 Cal. App. 4th 689 (2005)............................................................1, 15

*Student Gov't Ass'n v. Bd. of Trustees of Univ. of Mass.*,
  868 F.2d 473 (1st Cir. 1989) ..................................................................17

*Taiheiyo Cement Corp. v. Superior Court*,
  117 Cal. App. 4th 380 (2004)............................................................1, 15

*Trunk v. City of San Diego*,
  629 F.3d 1099 (9th Cir. 2011)................................................................20

*United States v. Belmont*,
  301 U.S. 324 (1937)................................................................................10

*United States v. Pink*,
  315 U.S. 203 (1942)..................................................................................9

*Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1983) .............................................................................8, 9

*von Saher v. Norton Simon Museum*,
  578 F.3d 1016 (9th Cir. 2009)............................................................1, 11

*Warner Cable Comm'cn, Inc. v. Niceville*,
  911 F.2d 634 (11th Cir. 1990)................................................................16

*Warren v. Fox Family Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003)..................................................................5

v

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000)...........................................................................19

*Whittlestone, Inc. v. Handi-Craft Co.*,
    618 F.3d 970 (9th Cir. 2010)...............................................................................3

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    132 S.Ct. 1421 (2012)...................................................................................10

*Zschernig v. Miller*,
    389 U. S. 429 (1968)..............................................................................passim

STATUTES

42 U.S.C. § 1983....................................................................................3, 4

OTHER AUTHORITIES

U.S. Const., Art. I, sec. 10 .....................................................................19

## I.    INTRODUCTION

Glendale's Rule 12(b) motion offers a lengthy discussion of the history regarding the horrific abuse suffered by the Comfort Women.  Mot. at 2-6.  This lawsuit neither challenges that historical record nor denies in any respect that "[t]he horror of [the Comfort Women's] ordeal can scarcely be overstated."[1]

The primary question in this case is a legal one that turns on the Constitution's "allocation of the foreign relations power to the National Government," which resulted from the Framers' "'concern for uniformity in this country's dealings with foreign nations.'"[2]  In particular, the question is whether Glendale's action constitutes "an intrusion . . . into the field of foreign affairs which the Constitution entrusts to the President and the Congress."[3]  The Supreme Court and lower courts have applied this principle with considerable frequency to invalidate a variety of actions that saw state or local governments attempt to establish their own foreign policies.[4]

---

[1]    Statement of Interest of the United States at 1, *Joo v. Japan*, No. 00-CV-2288 (D.D.C.) (filed Apr. 27, 2001) (Declaration of Christopher Munsey Ex. 14). Plaintiffs acknowledge the United States' statement that "[t]here is no dispute about the moral force animating [the Comfort Women's] quest to redress the wrongs done to them" (*id.*), as well as the more recent statement by the State Department that "what happened in that era to these women . . . is deplorable and clearly a grave human rights violation of enormous proportions."  Department of State, Daily Press Briefing Transcript, May 16, 2013, at 85-86 (statement of Jen Psaki, State Department Spokesperson) (Munsey Decl. Ex. 17).  Plaintiffs likewise acknowledge the statement of the Government of Japan that, "with the involvement of the [Japanese] military authorities of the day," the Comfort Women "suffered immeasurable pain and incurable physical and psychological wounds" that "severely injured the honor and dignity of" these Women.  Statement by Chief Cabinet Secretary Yohei Kono on the Result of the Study on the Issue of "Comfort Women," Ministry of Foreign Affairs of Japan (Aug. 4, 1993) (Munsey Decl. Ex. 7).

[2]    *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003).

[3]    *Zschernig* v. *Miller*, 389 U. S. 429, 432 (1968).

[4]    *See, e.g., Garamendi, supra; Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1076-77 (9th Cir. 2012) (en banc), cert. denied, 133 S. Ct. 2795 (2013); *von Saher v. Norton Simon Museum*, 578 F.3d 1016, 1029 (9th Cir. 2009), cert. denied, 131 S. Ct. 3055 (2011); *Deutsch v. Turner Corp.*, 324 F.3d 692, 719 (9th Cir. 2003); *Deirmenjian v. Deutsche Bank, A.G.*, 526 F. Supp. 2d 1068, 1089 (C.D. Cal. 2007); *Steinberg v. Int'l Comm'n on Holocaust Era Ins. Claims*, 133 Cal. App. 4th 689, 700-01 (2005); *Taiheiyo Cement Corp. v. Superior Court*, 117 Cal. App. 4th 380, 397-98 (2004); *Mitsubishi Materials Corp. v. Superior Court*, 113

(cont'd)

Glendale's action violates this constitutional principle because it intrudes on the federal government's exclusive power to establish governmental policy with respect to the United States' relations with foreign nations.   There can be no serious doubt that Glendale's action has had that effect: Glendale's action has attracted attention and criticism from the highest levels of the Government of Japan, up to and including the Prime Minister.   Because Glendale's attempt to interject itself into U.S. foreign policy violates the Constitution, and its arguments that this constitutional principle is inapplicable here are unavailing, the motion to dismiss should be denied.

## II.   LEGAL STANDARD

To survive a Rule 12(b) motion to dismiss, a plaintiff need only state a claim for relief that is "plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   The plausibility standard "is not akin to a probability requirement," *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009); "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In evaluating a motion to dismiss, a court must "accept all factual allegations in the complaint as true, . . . construe the pleadings in the light most favorable to the nonmoving party," *Hannan v. Maxim Integrated Prods., Inc.*, 394 F. App'x 434, 434 (9th Cir. 2010), and presume that "general allegations embrace whatever specific facts might be necessary to support" the claim.  *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (9th Cir. 1994).

Rule 12(f) permits a party to strike only "redundant, immaterial, impertinent, or scandalous matter."   Rule 12(f) motions are disfavored.  They will be granted only if the Court is convinced that "there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of Cal. App. 4th 55, 58, 79 (2003).

circumstances could the claim or defense succeed." *RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 561 (C.D. Cal. 2005).  Because they are disfavored, courts may require "a showing of prejudice by the moving party" in order for the party to obtain relief under Rule 12(f).  *Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002).  A Rule 12(f) motion may not be used, moreover, to procure the dismissal of all or part of a complaint. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010).  As with Rule 12(b) motions, in determining a Rule 12(f) motion to strike the court must view the pleadings in the light most favorable to the non-moving party.  *Oracle Am., Inc. v. Micron Tech., Inc.*, 817 F. Supp. 2d 1128, 1132 (N.D. Cal. 2011).

## III.   PLAINTIFFS ADEQUATELY ALLEGE A FEDERAL CLAIM.

At the outset, Glendale incorrectly claims that plaintiffs' first cause of action must fail because plaintiffs "invented a federal right where none exists," arguing that (1) "purely expressive" acts cannot be preempted and (2) no right of action is available under 42 U.S.C. § 1983 because "neither the Supremacy Clause nor the foreign affairs sections of the Constitution is a source of individual rights."  Mot. at 7-8.  We address the first point below, at Section VII, in connection with Glendale's First Amendment argument.  The second contention is wrong as a matter of law.

Three considerations are relevant to whether a constitutional provision "confers a 'right' within the meaning of § 1983": (1) whether the provision "creates obligations binding on the [defendant] governmental unit"; (2) whether "'[t]he interest [that] plaintiff asserts" is "[so] vague and amorphous [as] to be beyond the competence of the judiciary to enforce"; and (3) "whether the provision in question was intend[ed] to benefit the putative plaintiff."  *Dennis v. Higgins*, 498 U.S. 439, 448-49 (1991) (citations and internal quotation marks omitted).  In formulating this test, the Supreme Court disavowed the proposition "that § 1983 does not apply to constitutional provisions that allocate power."  *Id.* at 443 n.4.

The Court likewise "rejected attempts to limit the types of constitutional rights that are encompassed within the phrase 'rights, privileges, or immunities.'"  *Id.* at 445. And it emphasized that "[a] broad construction of § 1983 is compelled by the statutory language," "'repeatedly [holding] that the coverage of [§ 1983] must be broadly construed.'"  *Id.* at 443 (quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989)) (footnote omitted).

The *Dennis* test is satisfied by the Constitution's foreign affairs principle. There can be no doubt about the test's first two considerations:  the foreign affairs doctrine creates binding limits on state authority and those limits are within the competence of the judiciary to enforce—as decisions including *Zschernig*, 389 U.S. at 430, 432, *Garamendi*, 539 U.S. at 412-13, 427, *Movsesian*, 670 F.3d at 1076-77, and *Deutsch*, 324 F.3d at 712-15, among others, establish.  As for the third consideration, at a minimum the plaintiffs here are "arguably within the 'zone of interests' protected by the" foreign affairs doctrine (*Dennis*, 498 U.S. at 449); any contrary finding necessarily would mean that plaintiffs, such as those in *Garamendi*, would not have had the ability to advance their foreign affairs preemption claims.  Thus, "[t]his combined restriction on state power and entitlement to relief under the [foreign affairs principle] amounts to a 'right, privilege, or immunity' under the ordinary meaning of those terms."  *Id.*  Indeed, Justice Kennedy made precisely that point in his *Dennis* dissent, observing that "the Court's rationale [in *Dennis*] creates a § 1983 cause of action when a State . . . interferes with the federal power over foreign relations."  *Id.* at 463 (Kennedy, J., dissenting).  The *Dennis* majority did not take issue with that proposition.[5]

---

[5]  The complaints in *Garamendi* and *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 370-71 (2000), were brought to advance foreign affairs claims under Section 1983.  *See Nat'l Foreign Trade Council v. Baker*, 26 F. Supp. 2d 287, 293 (D. Mass. 1998) (amending complaint to add Section 1983 claim).  Although the ultimate rulings were based on a statute and executive order rather than the Constitution, those provisions were designed to advance national foreign policy
(cont'd)

## IV.    PLAINTIFFS SUFFICIENTLY PLEAD ARTICLE III STANDING.

Glendale also is incorrect in its next contention, that Plaintiffs lack standing in this action.  To have standing, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized; and (b) "actual or imminent, not conjectural or hypothetical."  There also must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action . . . ."  And it must be "likely," not merely "speculative," that the injury can be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

An association has standing to sue on behalf of its members when (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*, 528 U.S. 167, 181 (2000); *see also Sierra Club v. Morton*, 405 U.S. 727, 739-40 (1972).

To defeat a Rule 12(b)(1) standing motion, plaintiffs "need only show that the facts alleged, if proved, would confer standing upon [them]."  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998)).  In analyzing the issue, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir. 2000).  And in that analysis "[i]t is, of course, incumbent upon the courts to apply the standing doctrine neutrally, so that it does not become a vehicle for allowing claims by favored litigants and disallowing disfavored claimants from even getting their claims considered."  *Catholic League for Religious Rights v. City & Cnty. Of San Francisco*, 624 F.3d

_____

goals; that Section 1983 was appropriately advanced in those cases confirms that it is here as well.

1043, 1049 (9th Cir. 2010).  "Nor can standing analysis . . . be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true."  *Id.*  Under this standard, Glendale's standing argument cannot prevail.

### A.   Plaintiffs' Loss of Enjoyment Or Use of Glendale's Public Land Is A Sufficient Injury To Confer Standing.

The individual plaintiffs here have standing because the Complaint alleges that they personally suffered injury-in-fact traceable to Glendale's conduct, and a favorable decision is likely to redress their injuries.  The organizational plaintiff similarly has standing because its members suffered the same injury-in-fact, and thereby have standing to sue in their individual capacities.  *See Friends of the Earth*, 528 U.S. at 181.  The Complaint sufficiently alleges that (1) the individual and organizational plaintiffs, many of whom are Americans of Japanese descent, live in and around Glendale, *see Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1024 (8th Cir. 2012); (2) would like to use Glendale's Central Park and the Adult Recreation Center within the park; and (3) avoid doing so because the plaque is understood by them to disapprove of their nation of origin and of the Japanese people.[6]

Contrary to Glendale's assertions (*see* Mot. at 9), aesthetic and recreational interest in the use of public land plainly is sufficient injury to confer standing.  *See Friends of the Earth*, 528 U.S. at 182 ("plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity"); *Buono v. Norton*, 371 F.3d 543, 547 (9th Cir. 2004) ("We have repeatedly held that **inability to unreservedly use public land suffices as injury-**

---

[6]    Though not challenged by Glendale's Motion, the organizational plaintiff also meets the other two prongs of associational standing:  (1) the interests at stake are germane to the organization's purpose and (2) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *See Friends of the Earth*, 528 U.S. at 181.

1  **in-fact**. . . . Such inhibition constitutes 'personal injury suffered . . . as a
2  consequence of the alleged constitutional error.'").[7]

3  　　The controlling Ninth Circuit case, one strikingly similar to this case, is
4  *Barnes-Wallace v. City of San Diego*, 530 F.3d 776 (9th Cir. 2008), a decision
5  whose standing principles were recently reaffirmed.  *See Barnes-Wallace v. City of*
6  *San Diego*, 704 F.3d 1067, 1076-77 (9th Cir. 2012) ("Our prior decision on
7  standing [in this case] . . . [is] the law of the circuit.").  The plaintiffs, a lesbian
8  couple (the Breens) and an atheist couple (the Barnes-Wallaces), averred that they
9  would like to use a public park in which land had been leased to the Boy Scouts,
10  "but avoid[ed] doing so because they [we]re offended by the Boy Scouts'
11  exclusion [as members and scoutmasters], **and publicly expressed disapproval**,
12  of lesbians, atheists and agnostics."  530 F.3d at 784.  Although the "plaintiffs
13  never applied [with the Boy Scouts] to use the Youth Aquatic Center or Camp
14  Balboa" and no evidence showed that they were "actively excluded" from the land,
15  *id.* at 782, the Ninth Circuit held that they all had Article III standing because:

16  　　　　they would like to use Camp Balboa and the Aquatic Center,
17  　　　　but they have avoided doing so because they object to the Boy
　　　　Scouts' presence on, and control of, the land:  **They do not**
18  　　　　**want to view signs posted by the Boy Scouts** or interact with
19  　　　　the Boy Scouts' representatives in order to gain access to the
20  　　　　facilities.

21  *Id.*  Thus, the plaintiffs' avoidance of the public park as a result of the Boy Scouts'
22  public displays and guiding principles constituted sufficient injury.  *See* also
23  *Friends of the Earth,* 532 U.S. at 181-83 (plaintiffs living near a river at which
24  they wished to fish, hike, camp, and picnic but avoided due to concern that the
25  river was polluted by defendant had standing because they "adequately
26  documented injury in fact," *id.* at 183, and demonstrated that the defendant's
27  conduct "directly affected those affiants' recreational, aesthetic, and economic

28  ────────────
[7]　　All emphasis is added unless otherwise stated.

interests," *id.* at 184).

Likewise plaintiffs' injury here is their inability to visit and enjoy a public park without experiencing what they perceive to be Glendale's criticism of their nation of origin.  Plaintiffs allege both a personal interest in use of the public land and injury from a use of the land that they regard as offensive.  *See Barnes-Wallace*, 530 F.3d at 786.  To contest standing, defendants must show that plaintiffs are not injured by Glendale's use of public land to (in plaintiffs' view) criticize their nation of origin.  Given the clear allegations of the Complaint, Glendale cannot make such a showing here.[8]

### B.   Glendale Lacks Authority To Support Its Standing Challenge.

Implicitly conceding that its position is inconsistent with *Barnes-Wallace*, Glendale seeks to distinguish that decision on the ground that its principle applies only in Establishment Clause cases.  Mot. at 10.  But that contention is plainly wrong.  The plaintiffs in *Barnes-Wallace* advanced numerous claims not premised on the Establishment Clause (*see* 530 F.3d at 783), and the court of appeals' analysis relied on far more than Establishment Clause authority.  *See id.* at 784-85.

Nor was standing predicated upon the Boy Scouts' "control" and "dominion" of the public land, as Glendale suggests.  *See* Mot. at 10.  Indeed, the *Barnes-Wallace* plaintiffs had never applied to, or been excluded from, use of the land by the Boy Scouts.  530 F.3d at 782.  It was sufficient that the plaintiffs "would be confronted with symbols of the Boy Scouts' belief system if they used or attempted to gain access to Balboa Park and the Aquatic Center."  *Id.* at 784.

Glendale's reliance on *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1983) (*see* Mot. at 9-11), a decision that long predated *Barnes-Wallace*, does not dictate a contrary result.  In contrast to the *Valley Forge* plaintiffs, Maryland and Virginia residents who

---

[8]   Glendale does not dispute that plaintiffs satisfy the second prong of the standing test—that the relief sought would redress the claimed injury.

challenged conduct in Pennsylvania, plaintiffs here hardly "roam the country in search of governmental wrongdoing." *Id.* at 487. They live in Glendale and neighboring cities within Los Angeles County, and expressed an intent to use the Glendale park and its facilities. And Glendale is, in any event, wrong to suggest that *Valley Forge* held that noneconomic or psychological injury is **never** a sufficient injury. The *Valley Forge* majority warned against reading the opinion as Glendale suggests: "[W]e do not retreat from our earlier holdings that standing may be predicated on noneconomic injury." *Id.* at 486. *Valley Forge* thus did not hold that the plaintiffs lacked standing because their injury was psychological, but rather because they had not "alleged an injury of any kind, **economic or otherwise,**" sufficient to confer standing. *Id.* Here, in contrast, plaintiffs do allege an interest in using the land at issue and injury due to the loss of such use. Compl. ¶¶ 6, 8.

*Caldwell v. Caldwell*, 545 F.3d 1126 (9th Cir. 2008), also cited by Glendale (Mot. at 10), likewise fails to support Glendale's argument. The *Caldwell* plaintiff lacked standing to raise an Establishment Clause claim arising from a discussion of religious views on a University of California website **not** because the asserted injury was offended feelings, but because the plaintiff was not sufficiently related to the conduct alleged (*i.e.*, not the parent of a child directly exposed to unwelcome religious classroom conduct). *Id.* at 1132-33.

## V.    GLENDALE'S ACTION IS PREEMPTED BY THE FEDERAL GOVERNMENT'S EXCLUSIVE AUTHORITY TO REGULATE FOREIGN AFFAIRS.

The core issue presented here is whether Glendale has overstepped the carefully crafted constitutional limitations on state and municipal sovereignty. It has: Glendale's action intrudes on the foreign affairs power vested exclusively in the federal government.

"Power over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233

9

(1942).  The Supreme Court has explained that, "[i]n respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear."  *United States v. Belmont*, 301 U.S. 324, 331 (1937).  Consequently, "the Supreme Court has long viewed the foreign affairs powers . . . as reflections of a generally applicable constitutional principle that power over foreign affairs is reserved to the federal government."  *Deutsch*, 324 F.3d at 709.  Attempts by state or local governments to involve themselves in matters of foreign policy necessarily constitute "an intrusion . . . into the field of foreign affairs which the Constitution entrusts to the President and the Congress."  *Zschernig*, 389 U.S. at 432.  Municipalities are subject to the same limitations as states in this regard; leaving aside commercial relationships, neither is afforded any role in defining the nation's foreign policy prerogatives.  *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that **federal power in the field affecting foreign relations be left entirely free from local interference**.").

The long-standing recognition of the primacy of the federal government in the area of foreign policy is rooted in the "'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power in the first place."  *Garamendi*, 539 U.S. at 413; *see also* The Federalist No. 42, at 279 (James Madison) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations.").  As the Ninth Circuit has noted, "[t]o participate adeptly in the global community, the United States must speak with one voice and pursue a careful and deliberate foreign policy."  *Int'l Ass'n. of Machinists & Aerospace Workers, (IAM) v. Organization of Petroleum Exporting Countries (OPEC)*, 649 F.2d 1354, 1358 (9th Cir. 1981).  Accordingly, "where foreign affairs is at issue, the practical need for the United States to speak with one voice and ac[t] as one, is particularly important."

10

1  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S.Ct. 1421, 1438 (2012) (citation and

2  internal quotes omitted).

3      This principle is of such importance that federal authority is understood to

4  preempt the entire field of foreign relations: "'even in [the] absence of a treaty' or

5  federal statute, a state may violate the constitution by 'establish[ing] its own

6  foreign policy.'"  *Deutsch*, 324 F.3d at 709 (quoting *Zschernig*, 389 U.S. at 441).

7  This principle has been echoed repeatedly.  *See, e.g.*, *Movsesian*, 670 F.3d at 1072

8  ("[E]ven when the federal government has taken no action on a particular foreign

9  policy issue, the state generally is not free to make its own foreign policy on that

10  subject."); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 578 F.3d 1016,

11  1025 (9th Cir. 2009) ("the Supreme Court has found a state law to be preempted

12  because it infringes upon the federal government's exclusive power to conduct

13  foreign affairs, even though the law does not conflict with a federal law or

14  policy.").   Glendale's argument that, to establish preemption, "[p]laintiffs

15  must . . . show that the Monument conflicts with [a] federal policy" (Mot. at 20) is

16  therefore plainly wrong.[9]

17      It is true that, for field preemption to apply, the challenged action must have

18  "more than some incidental or indirect effect **in foreign countries**."  *Zschernig*,

19  389 U.S. at 434 (internal citations omitted); *Movsesian*, 670 F.3d at 1072.[10]  But

20  there can be no doubt that Glendale's placement of the Monument had such an

21  effect.   Reactions from the highest echelons of the Japanese government—

---

[9]    *Zschernig* is particularly instructive on this point.  There, the United States
22  filed an amicus brief **denying** that the Oregon escheat law under review "unduly
23  interfere[d] with the United States' conduct of foreign relations."  389 U.S. at 434.
    Even so, although the Oregon escheat statute conflicted with no federal law and
24  appeared to regulate property—a traditional area of state responsibility—the
    Supreme Court held the statute preempted because it "**required value-laden**
25  **judgments about the actions and policies of foreign nations**."  *Movsesian*, 670
    F.3d at 1073 (analyzing *Zschernig*).   That was a "matter[] for the Federal
26  Government, not for local probate courts." *Zschernig*, 389 U.S. at 437-38.

[10]    Glendale's statement that the Monument "has had, and will have, no effect
27  on U.S. foreign policy" (Mot. at 23) is irrelevant to field preemption analysis,
    where the foreign policy implications are assessed vis-à-vis their effect "in foreign
28  countries," not on U.S. foreign policy.

including the Prime Minister, the Chief Cabinet Secretary, and Japan's Ambassador to the United States—are detailed in plaintiffs' complaint. *See* Compl. ¶¶ 37-42. None of those reactions are disputed by Glendale. Japan's Chief Cabinet Secretary commented just two months ago: "This installation of a memorial statue by a municipal government in the U.S. is incompatible with the views of the Japanese Government." Prime Minister of Japan and His Cabinet, Press Conference by the Chief Cabinet Secretary, Feb. 21, 2014, *at http://japan.kantei.go.jp/tyoukanpress/201402/21_p.html*.

Moreover, these statements were made in the larger context of persistent tensions between two close allies of the United States, Japan and South Korea, concerning (among a number of other topics) the sufficiency of Japan's efforts to address its wartime legacy regarding Comfort Women. The government of South Korea states that Japan's actions are insufficient and calls on Japan "to accept its governmental responsibility, take responsible measures, and educate current and future generations with regard to the 'comfort women' issue." Republic of Korea, Ministry of Foreign Affairs, Statement by H.E. Yun Byung-se, Minister of Foreign Affairs of Republic of Korea at 25th Session of the UN Human Rights Council, Mar. 5, 2014, *at* http://www.mofa.go.kr/ENG/policy/humanright/issues/index.jsp?menu=m_20_60_20&sp=/webmodule/htsboard/template/read/engreadboard.jsp%3FtypeID=12%26boardid=11051%26seqno=313470.

For its part, Japan states that it is "deeply sympathetic and sensitive to women who experienced immeasurable pain and suffering as the 'comfort women,'" and has: (1) "extend[ed] its sincere apologies and remorse to all those women on various occasions such as the statement by the Chief Cabinet Secretary Yohei Kono in 1993," and (2) "[r]ecogniz[ed] that the 'comfort women' issue was a grave affront to the honor and dignity of a large number of women," by playing a role in the establishment of the Asian Women's Fund ("AWF") "to extend

12

atonement from the Japanese people to the former 'comfort women.'"[11]  Ministry of Foreign Affairs of Japan, The Views Of The Government of Japan On Issues Of History Including "Comfort Women," Nov. 6, 2013, *at* *http://www.mofa.go.jp/policy/page3e_000118.html*.   Additionally, the Japanese government has expressed the view that "all the issues [concerning Comfort Women] have been solved completely and ultimately by the treaty that was forged in 1965 [i.e., the Treaty on Basic Relations between Japan and the Republic of Korea, signed June 22, 1965]."  Ministry of Foreign Affairs of Japan, Press Conference with Deputy Press Secretary Tomohiko Taniguchi, Aug. 25, 2006, *at* http://www.mofa.go.jp/announce/press/2005/8/0826.html#8.

Accordingly, the March 25, 2014, meeting between the Japanese and South Korean heads of state referred to in Glendale's motion (at 23) was "carefully brokered to focus on regional security and avoid the flashpoint topics of Japan's wartime behavior, which have been at the center of the deterioration in the bilateral relationship."  Alastair Gale and Yuka Hayashi, *Japan, South Korea to Discuss Comfort Women*, Wall St. J., Apr. 14, 2014, *at* http://online.wsj.com/news/articles/ SB10001424052702303887804579500894292604078. Officials from the Japanese and South Korean Foreign Ministries "had a sincere and candid discussion" on April 16, 2014, at which "[t]hey exchanged the respective basic positions on the issue of comfort women," and future meetings on this subject are planned. Ministry of Foreign Affairs of Japan, Press Conference by Deputy Press Secretary/Deputy Director-General for Press and Public Diplomacy Koichi Mizushima, Apr. 17, 2014, *at* http://www.mofa.go.jp/press/kaiken/kaiken4e_ 000064.html.  Still, South Korea's relationship with Japan remains "contentious

---

[11]    Though the AWF was established by the Japanese government, compensation paid to former Comfort Women from the Fund came from private donations. *See* Statement of Tomiichi Murayama, President of the Asian Women's Fund, Digital Museum – The Comfort Women Issue and the Asian Women's Fund, *at* http://www.awf.or.jp/e3/dissolution.html. The AWF closed in March 2007. *Id.*

over historical issues, including the issue of 'comfort women.'"  H.E. Byung-se, Minister of Foreign Affairs, Republic of Korea, Ministry of Foreign Affairs, Keynote Speech at The Asian Plenum 2014, Minister of Foreign Affairs (Apr. 22, 2014), *at*  http://www.mofa.go.kr/ENG/press/speeches/minister/incumbent/index. jsp?menu=   m_10_40_10&sp=/webmodule/htsboard/template/read/engreadboard. jsp%3FtypeI D=12%26boardid=14137%26seqno=313660.

   Given the great diplomatic sensitivity of this issue in both nations, there can be no doubt that statements on this subject by other nations have important foreign relations implications. For that reason, such statements may by made only by the federal government, particularly the Executive branch.  Local government action that addresses matters of international concern carries "great potential for disruption or embarrassment" of U.S. foreign policy, *Zschernig*, 389 U.S. at 435; any adverse reaction by foreign governments to such a state action "of necessity would be directed at American [interests] in general, not just that of the . . . State, so that the Nation as a whole would suffer."  *Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 450 (1979).  And "**[t]his would be disastrous**, not only because of multiplicity and divergence of policies, but **because local decisions are often influenced by pragmatic local considerations which are not necessarily** controlling or even **relevant to national policy** as determined by the Federal Government at Washington."  *New York Times Co. v. City of New York Commission on Human Rights*, 41 N.Y.2d 345, 353 (1977).

   Although Glendale's actions may not be "as gross an intrusion in the federal domain as . . . others might be," that fact is not relevant under the legal principles governing field preemption analysis, because those actions "ha[ve] a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems."  *Zschernig*, 389 U.S. at 441.

   There is an obvious danger that governmental pronouncements on foreign affairs made by multiple state and local bodies could present a confusing picture of

14

U.S. policy, which is compounded by the danger that foreign governments will not have a clear sense of the division of governmental responsibility under the U.S. federal system.  If Glendale may assert a role in foreign affairs, so too may the fifty States and the tens of thousands of other cities in our Nation.  The resulting multiple statements of views would be the very antithesis of the federal Executive's authority to speak with one voice on matters of foreign affairs, and therefore is prohibited by the Constitution.

## VI.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE POLITICAL QUESTION DOCTRINE.

Glendale also argues that the plaintiffs' claims are barred under the political question doctrine, complaining that "[a] determination regarding the content of U.S. foreign policy is not for the court to make."  Mot. at 12.  As a preliminary matter, of course, no such determination is necessary because, "even when the federal government has taken no action on a particular foreign policy issue, the state [or any municipality, such as Glendale] generally is not free to make its own foreign policy on that subject."  *Movsesian*, 670 F.3d at 1072.  In this respect, any intrusion by Glendale that has "more than some incidental or indirect effect in foreign countries," *Zschernig*, 389 U.S. at 434, is proscribed, regardless of the content of U.S. foreign policy.

Indeed, even where conflict rather than field preemption is at issue making the particular nature of U.S. policy determinative, Glendale's argument is belied by the legion of cases in which courts, including the Supreme Court and the Ninth Circuit, have done exactly what Glendale says this Court cannot do:  assess U.S. foreign policy for the purposes of determining whether state action runs counter to that policy.  *See, e.g.*, *Garamendi*, 539 U.S. at 401-12 (holding unconstitutional California statute directing production of Holocaust-era insurance policies); *Deutsch*, 324 F.3d at 712-16 (holding unconstitutional California statute extending statute of limitations for claims by World War II slave laborers); *Taiheiyo*, 117

15

Cal. App. 4th at 398 (same); *Mitsubishi Materials*, 113 Cal. App. 4th at 79 (same); *Steinberg*, 133 Cal. App. 4th at 701 (holding unconstitutional California statute extending the statute of limitations for Holocaust-era insurance claims).[12]  This line of cases demonstrates that courts can and do identify U.S. foreign policy so as to assess a potential conflict between that policy and state law; in none of these cases was there any suggestion that the political question doctrine had relevance.  And that should not be surprising: the political question doctrine concerns whether an issue is decided by the appropriate branch **within the federal government**, rather than as **between federal and state** authorities.  *See Los Angeles Cnty Bar Ass'n v. Eu*, 979 F.2d 697, 701 (9th Cir. 1992) (explaining that "the political question doctrine arises from 'the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States'").  Accordingly, the doctrine "has at best limited applicability" to actions challenging state and local action as violative of the federal Constitution. *Id.* at 701-02.

## VII.   GLENDALE DOES NOT HAVE A FIRST AMENDMENT RIGHT TO SPEAK ABOUT FOREIGN POLICY ISSUES.

Finally, Glendale places much weight on the assertions that its right to speak on this subject is itself protected by the First Amendment.  Mot. at 15-19.  But it is

---

[12]   Glendale's discussion of *Joo v. Japan* fails to address the critical legal point. The *Joo* plaintiffs, former comfort women who were nationals of China, Korea, the Philippines, and Taiwan, sought monetary relief through private litigation against Japan, arguing that their individual claims were not extinguished by treaties executed between their respective governments and Japan.  *Joo v. Japan*, 413 F.3d 45, 46 (D.C. Cir. 2005).  The court decided that, in light of the Executive's primary authority in this area, interpretation of those treaties was appropriately delegated to the Executive Branch because "adjudication by a domestic court not only 'would undo' a settled foreign policy of state-to-state negotiation with Japan, but also could disrupt Japan's 'delicate' relations with China and Korea, thereby creating 'serious implications for stability in the region.'"  *Id.* at 52.  The United States urged that result in *Joo* because the adjudication of the plaintiffs' claims would require the court "to judge the policy considerations underlying the drafting, negotiation and ratification" of the U.S. treaty with Japan that ended World War II. U.S. Statement of Interest in *Joo v. Japan*, No. 00-CV-2288 (Apr. 27, 2001) (Munsey Decl. Ex. 14) at 25.  That reasoning has no bearing on the very different question presented here—whether a municipality may engage in its own foreign relations.

---

well established that government entities, like Glendale, do **not** have First Amendment speech protection.  *Warner Cable Comm'cn, Inc. v. Niceville*, 911 F.2d 634, 638 (11th Cir. 1990) ("the government does not have a constitutionally-protected right to speak"); *Student Gov't Ass'n v. Bd. of Trustees of Univ. of Mass.*, 868 F.2d 473, 481 (1st Cir. 1989) ("a state entity, itself has no First Amendment rights"); *Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 380 (5th Cir. 1989) ("the first amendment does not protect government speech"); *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1038 n. 12 (5th Cir. 1982) (en banc) ("[g]overnment expression" is "unprotected by the First Amendment"); *R.J. Reynolds Tobacco Co. v. Bonta*, 272 F. Supp. 2d 1085, 1101-02 (E.D. Cal. 2003) ("the government does not enjoy protection for its speech under the First Amendment.").

That is because "[t]he First Amendment protects [citizens and] the press **from** governmental interference; it confers no analogous protection **on** the Government."  *See Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 (1973) (Stewart, J., concurring).  Although Glendale urges the Court to hold that the Monument is constitutionally protected from foreign affairs preemption under the First Amendment, there is no authority that "suggests that a state government's First Amendment interests, **if any**, should weigh into a consideration of whether a state has impermissibly interfered with the federal government's foreign affairs power."  *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 62 (1st Cir. 1999) (holding that Massachusetts' Burma Law is not shielded by the First Amendment)*, aff'd on other grounds,* 530 U.S. 263 (2000).

### A.   Government Speech Is Constrained By The Constitution.

Because it is not protected by the First Amendment, Glendale does not have unfettered authority to engage in "government speech."  Mot. at 16.  *See Creek v. Village of Westhaven*, 80 F.3d 186, 193-94 (7th Cir. 1996) ("Speech by government, even when not cast in the form of a command, . . . cannot be equated

17

for all purposes to speech by an individual.  It remains an official act . . . A contrary conclusion would permit government to undermine the duties that the Constitution imposes upon it . . . .").

In particular, "government speakers are bound by the Constitution's other proscriptions" (*Pleasant Grove City, Utah v. Summum* 555 U.S. 460, 482 (2009) (Stevens, J., concurring)); unsurprisingly, "government speech, like government action, is not without constitutional limitation." *R.J. Reynolds*, 282 F. Supp. 2d at 1101.  Thus, for example, "recognizing permanent displays on public property as government speech will not give the government free license to communicate offensive or partisan messages." *Summum* 555 U.S. at 482 (Stevens, J., concurring).[13]  Similarly, "government speech must comport with the Establishment Clause."  *Id.* at 468 (majority opinion).  And unlike private individuals, government entities are not permitted to pick and choose any message they wish to impart if it violates other constitutional commands.  *Summum*, 555 U.S. at 486 (Souter, J., concurring) ("If the monument has some religious character, the specter of violating the Establishment Clause will behoove [the government] to take care to avoid the appearance of a flatout [sic] establishment of religion."); *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 841 (1995) (noting the "critical difference between **government** speech endorsing religion, which the Establishment Clause forbids, and **private** speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.").

Government speech is also limited by the Equal Protection Clause. *Summum*, 555 U.S. at 482 (Stevens, J., concurring).  "[M]unicipalities … do not … have the right to foment, whether through speech or otherwise, governmental

---

[13]     In *Summum*, the Supreme Court ruled that a municipality cannot be forced to place a public monument in a public park in which other donated monuments were previously erected. (i.e., the government cannot be forced by citizens to speak a certain message). 555 U.S. at 464.  It does not stand for the proposition advanced by Glendale:  that government speech cannot be limited by the constitutionally-mandated foreign affairs doctrine.

discrimination on the grounds of race." *Creek*, 80 F.3d at 193. This is unlike expressive associations that have the right, as a group, to pursue discriminatory policies that are antithetical to the concept of equality for all persons. *See Boy Scouts of Am. v. Dale*, 530 U.S. 650, 659-60 (2000); *White v. Lee*, 227 F.3d 1214, 1224 (9th Cir. 2000).

Foreign policy is another constitutionally-grounded limitation on speech by state and local governments. *See* U.S. Const., Art. I, sec. 10, cl. 1 ("No state shall enter into any treaty, alliance, or confederation;" *id*., cl. 3 ("No state shall … enter into any agreement or compact with … a foreign power, or engage in war unless actually invaded"). Thus, "a state may violate the constitution by 'establish[ing] its own foreign policy.'" *Deutsch*, 324, F.3d at 709. The Constitution requires "the field affecting foreign relations be left entirely free from local interference." *Hines*, 312 U.S. at 63.

In an attempt to circumvent this basic principle, Glendale asserts that expressive, non-regulatory action simply cannot be preempted by federal law, pointing to the long tradition of state officials issuing proclamations on many subjects. Mot. at 7, 19-20. But that simply is not so. The Supreme Court has recognized that public monuments, like the one here, differ from statements made by speakers, leaflets distributed by individuals, and signs held by protesters, because they "endure [and] monopolize the use of the land on which they stand and interfere permanently with other uses of public space." *Summum*, 555 U.S. at 479.[14] Such a monument is not a transient and hortatory statement;[15] it is a

---

[14] Glendale's repeated reliance on *Alameda's Newspapers, Inc. v. City of Oakland*, 95 F.3d 1406, 1414-15 (9th Cir. 1996) unavailing. In *Alameda*, the circuit found that a city resolution urging citizen support for a local newspaper boycott was neither regulatory nor coercive but rather "a declaration of principle, rather than an exercise of governmental powers." Here, however, the decision to dedicate public land to the plaque, to the exclusion of other messages, is an obvious exercise of the municipality's powers and not merely a declaration of principle.

[15] Even as to such proclamations, *Movsesian* left open whether there were circumstances where foreign affairs field preemption would be appropriate. 670 F.3d at 1077 n.5. In this respect, Glendale's claim that public school curriculum
(cont'd)

permanent act of government with a continuing impact on those who see it.  Such state and local monuments (and, indeed, other, less permanent displays) repeatedly have been held to violate the Establishment Clause (*see*, *e.g.*, *Trunk v. City of San Diego*, 629 F.3d 1099, 1125 (9th Cir. 2011) (cross monument violated the Establishment Clause); *Separation of Church & State Comm. v. City of Eugene of Lane Cnty., State of Or.*, 93 F.3d 617, 620 (9th Cir. 1996) (per curiam) (cross placed on public land violated the Establishment Clause), a form of preemption of state action by federal constitutional law.

Aside from extolling the obvious virtues of free speech, Glendale fails to cite a single decision that permits the state to ignore the constitutional limitations on **government** speech.  We are aware of no such decisions.

### B.  Glendale's Plaque Is Not The Speech Of Its Individual City Council Members.

Glendale's attempt to conflate its speech with that of its individual city council members to trigger First Amendment protection also is incorrect as a matter of law.  Even if elected officials are afforded "wide latitude under the First Amendment to express their views" (Mot. at 17), the city council as a legislative body does not receive such protection.  It is well settled that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  Just so here:  when the council permitted the emplacement of the Monument, it did so as the Glendale City Council, not as individual council members.  The First Amendment does not apply to that decision.

cannot be preempted by the foreign affairs power is without support.  Glendale has cited no case in which a foreign affairs challenge to curriculum was made.  Nor does *Griswold v. Driscoll* support Glendale in this regard; in that case, the First Circuit held that a school board's decision not to include contra Armenian Genocide viewpoints in its curriculum guide "did not implicate the [plaintiff association's] first amendment" rights. 616 F.3d 53, 60 (1st Cir. 2010).  There was no mention of the foreign affairs power.  Moreover, the *Griswold* court expressly stated that it was not deciding whether the drafting and revision of school curriculums constitutes government speech and, in fact, expressed skepticism that the doctrine would apply. *Id.* at 59 n.6.

1    Glendale fails to cite a single decision in support of its assertion that the
2    council members' individual First Amendment rights apply here.   It instead
3    selectively plucks phrases from inapposite cases that address the First Amendment
4    protections afforded to elected officials when attempts are made to penalize them,
5    **individually,** for asserting their opinions.   *See Bond v. Floyd*, 385 U.S. 116, 137
6    (1996) (disqualification of a legislator from membership in the Georgia House of
7    Representatives because his statements violated his right to free expression under
8    the First Amendment); *DeGrassi v. City of Glendora*, 207 F.3d 636, 647 (9th Cir.
9    2000) (city council member's exclusion from closed city council meeting because
10   she was a party to the litigation being discussed did not offend the First
11   Amendment).   But plaintiffs here are not seeking to impose any liability or penalty
12   on the individual members of Glendale's City Council.

13         Finally, Glendale's reliance on the *Noerr-Pennington* doctrine is misplaced.
14   It is undisputed that Glendale did not install the Monument for the purpose of
15   petitioning the federal government or anyone else on behalf of its residents;
16   Glendale does not now claim that to have been the Monument's purpose. *Cf.*
17   *Manistee Town Center v. Glendale*, 227 F.3d 1090 (9th Cir. 2000) (applying
18   *Noerr-Pennington* immunity to lobbying activities by the city council to a county
19   urging the county not to lease space from a certain individual).   Nor could the
20   installation of a Monument qualify as a petitioning activity, particularly not here,
21   where the Monument does not petition or lobby the U.S. government, or any
22   subdivision thereof, to take action.   *Cf. Kearney v. Foley & Lardner, LLP*, 590
23   F.3d 638 (9th Cir. 2009).

24
25
26
27
28

1

## VIII.  CONCLUSION

2          For the reasons discussed above, Glendale's Motion to Dismiss or to Strike

3   should be denied.

4    Dated:  April 28, 2014                    MAYER BROWN LLP
                                               NEIL M. SOLTMAN
5                                              MATTHEW H. MARMOLEJO
                                               RUTH ZADIKANY
6                                              REBECCA B. JOHNS

7
                                               By:  ___s/ Neil M. Soltman_____
8                                                     Neil M. Soltman
                                               Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28